**MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, a federally recognized Indian Tribe; and Billy Cypress, Plaintiffs,**

v.

**UNITED STATES of America; U.S. Department of the Interior; Barbara West, individually as well as in her official capacity as Special Assistant to the Assistant Secretary of the Interior for Fish, Wildlife and Parks; Richard G. Ring, individually as well as in his official capacity as Superintendent of Everglades National Park; U.S. Army Corps of Engineers; and South Florida Water Management District, Defendants.**

No. 95–0532–CIV.

United States District Court, S.D. Florida, Miami Division.

Aug. 1, 1997.

Ruth Clements, South Florida Water Management Dist., West Palm Beach, FL, for Defendant (SFWMD).

## OMNIBUS ORDER

EDWARD B. DAVIS, Chief Judge.

BEFORE THE COURT are several motions: (1) the Federal Defendants' Motion for Summary Judgment (D.E.# 45); (2) the Motions of Individual Defendants West and Ring for Summary Judgment and to Dismiss for Lack of Personal Jurisdiction (D.E.# 47); (3) Defendant South Florida Water Management District's Motion for Final Summary Judgment (D.E.# 51); (4) Defendant South Florida Water Management District's Motion to Strike Opposition Memorandum (D.E.# 102); (5) the Plaintiffs' Motion for Leave to File a Memorandum of Law in Opposition to the District's Notice of Filing (D.E.# 110); (6) the Plaintiffs' Motion to Strike Notice of Filing (D.E.# 111); (7) the Plaintiffs' Motion to Foreclose Summary Judgment on the issue of Eleventh Amendment Immunity (filed July 8, 1997); and (8) the Federal Defendants' Motion to Strike Supplemental Affidavit of Truman Duncan (filed July 14, 1997).

The motions raise a number of issues relating to flooding in 1994 and 1995 of land occupied by the Miccosukee Tribe of Indians of Florida ("the Miccosukee Tribe" or "the Tribe"). The Tribe and its Chairman filed a seven-count complaint on March 16, 1995, asserting breach of trust, due process and equal protection claims against the Defendants for allegedly refusing to alleviate flooding on three separate parcels of land in the Florida Everglades occupied by the Tribe. The complaint seeks a writ of mandamus and damages.

The Plaintiffs moved for a preliminary injunction, which the Court denied on March 31, 1995, finding that they had not established a likelihood of success on the merits. The Defendants filed their respective motions for summary judgment in May 1995. The Court denied the Plaintiffs' motion to foreclose summary judgment pending discovery in August 1995. The Court notes that it previously allowed the Plaintiffs to voluntari-

Dexter Lehtinen and Dione C. Carroll, Lehtinen, O'Donnell, Vargas & Reiner, Miami, FL, for Plaintiff.

James M. Upton, Richard Montague, Asst. Attys. Gen., U.S. Dept. of Justice, Washington, DC, for Federal Defendants.

ly dismiss their claims against Defendants Barbara West and Richard Ring in their individual capacities (D.E.# 109), thereby rendering the summary judgment motion of those Defendants (D.E.# 47) moot.

 The remaining parties have extensively briefed the issues and submitted hundreds of pages of supporting documents. The Court has carefully considered the lengthy record in this case, as well as the oral arguments of counsel presented at the July 15, 1997 hearing.[1] After a thorough review, the Court will grant summary judgment in favor of all remaining Defendants.

## FACTUAL BACKGROUND

### A. The Parties

The Miccosukee Tribe is a federally recognized Indian Tribe living on land in and around Everglades National Park. Plaintiffs' Consolidated Response in Opposition to the Defendants' Motion for Summary Judgment ("Response") at 2–5. Plaintiff Billy Cypress is the Tribe's Chairman. Response at 8.

Defendants United States of America, United States Department of the Interior, United States Army Corps of Engineers, Barbara West (Special Assistant to the Assistant Secretary of the Interior for Fish, Wildlife and Parks), and Richard G. Ring (Superintendent of Everglades National Park) (collectively the "Federal Defendants"), are responsible for the design, implementation and continued supervision of flood control and water management projects in and around Everglades National Park. Order Denying Motion for Preliminary Injunction ("P.I.Order") at 2. Defendant South Florida Water Management District ("SFWMD" or "the District") is a political subdivision of the state of Florida that oversees the operation of those projects in conjunction with the Army Corps of Engineers ("the Corps"). Id.

### B. Tribal Occupation of the Land at Issue

The Miccosukee Tribe has lived in the area that now is Florida for hundreds of years. Response at 2. However, any "aboriginal" rights that the Tribe had to Florida land were extinguished when, as part of a court settlement, the United States paid $16 million to the Seminole Nation of Indians to compensate its members for their territory.[2] See Seminole Indians of Fla. and Seminole Nation of Okla. v. United States, 13 Indian Claims Comm'n 326 (1964); Id., 38 Indian Claims Comm'n 91; United States v. Dann, 470 U.S. 39, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985).[3]

Three separate areas in and around Everglades National Park are at issue in this lawsuit. Attach. 1 and 2 to Federal Defendants' Proposed Findings of Uncontroverted Fact; Belli Decl. at ¶ 2(b). First, the Miccosukee Federal Indian Reservation ("the Reservation") comprises about 75,000 acres in western Dade and Broward counties bisected by Interstate 75. Response at 4; Florida Statutes Chapter 285. Almost 50,000 acres of the Reservation are located within Water Conservation Area 3A ("WCA 3A"), which is part of the flood control area mentioned in Section A supra. The Lease at 2. No tribal members currently reside on the Reservation. Response at 4.

The second parcel is known as the Leased Area. It is a 189,000-acre tract of land to the

---

**1.** At the hearing, counsel for the Plaintiffs renewed their motion to foreclose summary judgment pending discovery. Plaintiffs' counsel did not state what specific facts he expected further discovery to produce. A party opposing summary judgment must rely on more than vague assertions that additional discovery will produce needed, but unspecified facts. Barfield v. Brierton, 883 F.2d 923, 931 (11th Cir.1989). Granting summary judgment on the basis of affidavits is proper under Federal Rule of Civil Procedure 56. A party may not defeat a properly supported summary judgment motion by raising general questions about an opponent's affidavits. Robinson v. Cheney, 876 F.2d 152, 162 (D.C.Cir.1989).

There is no need for a district court to allow a party to present additional evidence or cross examine affiants where it has raised no genuine issue of material fact. LCM Enter., Inc. v. Town of Dartmouth, 14 F.3d 675, 681 (1st Cir.1994).

**2.** The Miccosukee Tribe is a successor in interest to the Seminole Nation. Response at 2 n. 2. The Federal Defendants do not dispute this. Motion for Summary Judgment at 12 n. 6.

**3.** See also The Florida Indian Land Claims Settlement Act of 1982, codified at 25 U.S.C. §§ 1741–1749, discussed infra.

east and south of the Reservation and to the north of Everglades National Park, to which the Tribe holds a perpetual lease ("the Lease") from the state of Florida. *See* the Lease. The Leased Area is located entirely within WCA 3A. *Id.* The Tribe and the state entered into the Lease as part of the settlement in *Miccosukee Tribe of Indians of Fla. v. Florida,* No. 79–253–CIV–KEHOE (S.D. Fla. April 16, 1982) ("the Settlement Agreement"). *Id.*

In return for the Lease and certain hunting, fishing, frogging, residential and commercial rights in the Leased Area, the Tribe agreed to give up all aboriginal title claims to land in Florida. Settlement Agreement at 2, 3, 7, 8. In addition, the Settlement Agreement gave the SFWMD the right to operate its flood control projects in the Leased Area. *Id.* at 5. The Settlement Agreement was approved by Congress in The Florida Indian Land Claims Settlement Act of 1982, codified at 25 U.S.C. §§ 1741–1749. Response at 5.

The Lease incorporated all terms of the Settlement Agreement. The Lease at 3, 14. It gave the Tribe the right to farm the Leased Area, reside there, and use it for religious and cultural purposes. The Lease at ¶¶ 3(b), 3(c). But those rights were not absolute. *Id.* at ¶ 6. The Lease states that all of the Tribe's rights listed in Paragraphs 1–5 and 7 are subject to the rights of the SFWMD and the Corps to operate flood control and water management projects in the Leased Area. *Id.*

Historically, islands of trees in the Leased Area have been the site of the Tribe's religious and cultural practices. Terry Aff. at ¶ 7. The tree islands provide dry spots within the Everglades where tribal members can build traditional Indian huts known as chickees, and plant corn and other vegetables. *Id.* An integral part of the Tribe's religious tradition is the spring planting of corn, accompanied by the Green Corn Dance. *Id.* at ¶¶ 7, 8. The tree islands also are a source of plants used in traditional tribal medicines. *Id.* at ¶ 11.

The third area in question is known as the Permit Area, and is located directly south of the Leased Area and WCA 3A. Response at 3; Federal Defendants' Motion at 3. The Permit Area is a 333–acre strip of land, 5 1/2 miles long and 500 feet wide, located on either side of U.S. Highway 41 at the northern edge of Everglades National Park. Response at 3; Federal Defendants' Motion at 3. It is the Tribe's primary residential, commercial and administrative center. Response at 3; Federal Defendants' Motion at 3. The Tribe occupies the land pursuant to a Special Use Permit from the United States, negotiated in conjunction with the creation of the Park. Response at 3. The Permit is subject to federal statutes giving the National Park Service discretion in operating the Park. Attach. 15 to Federal Defendants' Proposed Finding of Uncontroverted Fact at ¶ 22.

### C. Management of the Land

A variety of federal and state laws, as well as the Lease, the Settlement Agreement, and the Special Use Permit, control management of the land at issue in this case. Federal Defendants' Motion at 6–9. For example, the National Park Service Organic Act, 16 U.S.C. § 1 *et seq.,* and the Everglades National Park Act, 16 U.S.C. § 410, control management of Everglades National Park. Belli Decl. at ¶ 1.

The National Park Act states that the purpose of creating national parks is to "conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. Congress has further indicated that "the protection, management, and administration of these areas . . . shall not be exercised in derogation of the values and purpose for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress." 16 U.S.C. § 1a–1.

The Department of the Interior, through the National Park Service, manages Everglades National Park. 16 U.S.C. § 410b. The Everglades National Park Act requires that "the area . . . shall be permanently reserved as a wilderness, and no development for the project or plan for the entertainment

of visitors shall be undertaken which will interfere with preservation intact of the unique flora and fauna and the essential primitive natural conditions now prevailing in this area." 16 U.S.C. § 410c. Section 410b qualifies that mandate, specifically reserving rights to the Seminole Nation: "nothing in Sections 410 to 410c ... shall be construed to lessen any existing rights of the Seminole Indians *which are not in conflict with the purposes for which the Everglades National park is created.*" 16 U.S.C. § 410b (emphasis added). Section 410b further states that the Park Service must manage the Park subject to the provisions of 16 U.S.C. § 1. *Id.*

The Everglades region, including WCA 3A, also is subject to the provisions of the Central and Southern Florida Project for Flood Control and Other Purposes (the "C & SF Project"). Vearil Decl. at ¶ 4. Congress established the C & SF Project, which included the area that later became WCA 3A, in The Flood Control Act of 1948. Pub. Law No. 80–858, 62 Stat. 1171 (1948). *See also* The Flood Control Act of 1954, Pub. Law No. 83–780, 68 Stat. 1256 (1954); The Flood Control Act of 1968, Pub. Law No. 90–483, 82 Stat. 739 (1968). The Corps operates the C & SF Project. Vearil Decl. at ¶¶ 4, 5, 8.

The flood control acts established three interconnecting reservoirs, known as Water Conservation Areas, that total about 1,350 square miles in Dade, Broward and Palm Beach counties. *Id.* at ¶¶ 4–10. The reservoirs were created for several reasons: controlling flooding and water flow in Everglades National Park and surrounding areas; irrigating agricultural areas; directing water flow away from the developed, eastern seaboard of South Florida; and enhancing fish, wildlife and recreation in and around the Park. *Id.* But the overall purpose was to help maintain the Everglades in its natural state. *Id.* at ¶ 4. Because of the varied goals of the C & SF Project, Congress gave the Corps broad discretion in how to operate it. *Id.* at ¶¶ 5, 8.

To implement the Project, the Corps constructed an elaborate network of water control structures, including canals, spillways, levees, culverts, and pumping stations. *Id.* at ¶¶ 4–14. Operating criteria and schedules for the three Water Conservation Areas are spelled out in the October 1992 Water Control Plan for Water Conservation Areas–Everglades National Park and ENP–South Dade Conveyance System. *Id.* at ¶ 8. The schedules include detailed instructions on operating project spillways. *Id.* The schedules control water flow during the wet and dry seasons, and are designed to preserve vegetation, fish and wildlife in the Water Conservation Areas. *Id.*

The operating criteria for WCA 3A are set out in the June 1993 Final Environmental Assessment for the Experimental Program of Water Deliveries to Everglades National Park ("the Environmental Assessment"). *Id.* at ¶¶ 11–15; P.I. Order at 6.[4] The criteria contain schedules of when certain spillways and levees are to be opened and closed to control the flow of water into WCA 3A, and out of the area into Everglades National Park. *Id.* at ¶ 14. For example, the regulations specify that one set of structures, known as S–333, are to be closed when water levels at a downstream trigger well are above 6.8 feet, and are to be opened when the levels fall below 6.8 feet. *Id.* at ¶ 18.

The SFWMD is the Corps' local sponsor and operator of the C & SF Project. Mierau Aff. at ¶ 3. The District runs the various water control structures according to the Corps operating criteria. *Id.* However, the Corps directly controls the primary water control structures in the Water Conservation Areas, including a series of structures known as S–12 that regulate water flow out of WCA 3A. *Id.* at ¶¶ 3, 4.

Roughly two-thirds of the Tribe's Federal Reservation and the entire Leased Area are located within WCA 3A and the C & SF Project, and thus are subject to the Congressionally established authority of the Corps and the District to operate the Project. *See* Discussion, Section B *supra.* In addition, the Settlement Agreement and the Lease subject the Tribe to the authority of the Corps and the District to administer the C &

---

4. This Court approved the Environmental Assessment in prior litigation. *See South Dade Land*

*Corp. v. United States,* No. 93–2210–CIV–DAVIS (S.D.Fla.1993).

SF project. *Id.* The Permit Area is located within the boundaries of Everglades National Park, and thus is subject to the Park Service's Congressionally established mandate to run the Park. *Id.*

### D. Flooding Before Tropical Storm Gordon

During September and October of 1994, the Water Conservation Areas received 14.71 inches of rain, five inches above normal. Duncan Aff. at ¶ 2.[5] This resulted in the highest surface water levels recorded since 1947 in the Everglades. Ex. E to Response. The heavy rains flooded tribal land throughout the Federal Reservation, the Leased Area and the Permit Area. Terry Aff. at ¶ 2. The flooding was so severe that on September 29, 1994, public access to WCA 3A was closed. *Id.* at ¶ 7. The high water also forced the tribe to close the Federal Reservation to the public. *Id.*

The flooding was not limited to tribal land. During this time, six to twenty inches of water covered the entrance, parking lot and other areas of the Everglades National Park Shark Valley Visitors Center. Doren Decl. at ¶ 7. The high water forced Park officials to close Shark Valley for several days in late October and early November. Belli Decl. at ¶ 3. The rains also affected the Park's Chekika Recreation Area east of Shark Valley. *Id.* at ¶ 2(e). In addition, there was localized flooding in other areas of the Park, as well as in adjacent developed areas. Doren Decl. at ¶ 5, Johnson Decl. at ¶ 7 (Section 1). Some of the Park flooding was due to a decision by the Corps and the District to release water from WCA 3A into the Park in an attempt to reduce high water in the conservation area. Doren Decl. at ¶ 5.

In mid–October, tribal officials began requesting emergency relief from state and federal authorities. Duncan Aff. at ¶ 3; Cortinas Aff. at ¶ 2. Even before that, Park

officials had taken steps to relieve flooding in WCA 3A. Johnson Decl. at ¶¶ 1–5 (Section 1). After consulting with Corps and District officials, Park authorities in early September approved opening the S–12 structures to increase water flow out of WCA 3A into the western Shark Slough basin. *Id.* at ¶ 4.[6]

On October 17, 1994, several tribal officials, including Water Resources Director Truman Duncan and attorney Angel Cortinas, met with the District's Deputy Executive Director, Michael Slayton. Duncan Aff. at ¶ 3; Cortinas Aff. at ¶ 2. They told Slayton they needed emergency help to alleviate the flooding. *Id.* Slayton suggested that the District could reduce water levels by increasing water flow out of WCA 3A through the S–12 and the S–333 structures, but indicated he needed authorization from the Corps and Park officials to do so. Duncan Aff. at ¶ 3. The following day, Duncan spoke to several Corps officials about the problem. *Id.* at ¶ 4. The Corps did not want to increase water flow through the S–333 structures because it would increase flooding throughout western and southern Dade County. *Id.* However, Corps officials suggested that they could increase water flow out of WCA 3A by cutting weeds and other vegetation behind the S–12 structures. *Id.*

On October 19 and 20, Cortinas met with several Corps and District representatives to reiterate the need for immediate action. Cortinas Aff. at ¶ 3. On November 3, the Bureau of Indian Affairs wrote to Defendant West on behalf of the Tribe, requesting that Park officials authorize the Corps to remove the vegetation behind the S–12 structures and open the gates to another water control structure known as L–67. Ex. E to the Response. The letter indicated that the Corps supported both ideas, but that Park officials had to approve because the S–12 and L–67 structures were on Park land. *Id.* The Florida Game and Fresh Water Fish Commission also supported both requests. Ex. I to Re-

---

5. The heavier-than-normal rainfall began in May 1994. Khanal Aff. at ¶ 4. Between May and October 31, 1994, parts of WCA 3A received 52 inches of rain, 10 inches above normal. *Id.* As a result, WCA 3A recorded an all-time-high water level from mid–October through the beginning of November. Mierau Aff. at ¶ 5.

6. At about the same time, the Park closed the S–333 structures because of flooding in the East Everglades. This reduced the water flow out of WCA 3A and partially negated the effect of opening the S–12 structures. Johnson Decl. at ¶ 3 (Section 1).

sponse (Letter from the Commission's Executive Director to Defendant Ring).

On November 4, Cortinas wrote to West about the problem, and on November 7 he talked to her on the telephone. Cortinas Aff. at ¶¶ 5, 6. The record does not indicate how West responded, although Cortinas claims that on November 14 he was "advised that Defendants West and Ring did not want to deal with the Tribe's flooding emergency." *Id.* at ¶ 9.

Park officials opposed removing the vegetation behind the S–12 structures because of concerns that increasing water flow into the Park would adversely affect water quality, vegetation and wildlife. Johnson Decl. at ¶ 9 (Section 1). The Corps operating criteria prevented it from opening the S–333 structures because of high water levels downstream. *Id.* at ¶¶ 18–21; Mierau Aff. at ¶ 10.

But Tribe requests for help did not go entirely unheeded. The Corps and the District took several steps to try to relieve flooding in WCA 3A. They reduced the release of water from Lake Okeechobee into canals that carry it through WCA 3A and the Park en route to Florida Bay, and increased water releases from the Conservation Areas into populated areas to the east. Ex. I to the Response; Mierau Aff. at ¶¶ 7–9; Vearil Decl. at ¶¶ 15–18. In addition, during the week of November 14, the Corps placed two temporary berms at the eastern and western ends of the Permit Area to try to reduce water flow into the area. Doren Decl. at ¶ 8. The Corps also installed two pumps to push water out of the area. *Id.* This reduced flooding in the Permit Area, and *increased* it in Shark Valley. *Id.* Finally, beginning in early October, the Corps allowed tribal members to add fill material to raise the elevation of their houses, driveways, and government and business buildings. Belli Decl. at ¶ 4.

### E. Tropical Storm Gordon and the Aftermath

From November 15–17, 1994, Tropical Storm Gordon soaked South Florida with torrential rains, producing a fifty-year flood

in the Everglades area. Khanal Aff. at ¶ 6.[7] As a result, WCA 3A received between 9 and 16.82 inches of rain during November, compared with a normal average of 1.75 to 2 inches. *Id.* This extensive rain exacerbated the already-severe flooding problems in WCA 3A, the Park, and the surrounding area. *See, e.g.,* Affidavits of Duncan, Terry, and F.K. Jones; Declarations of Belli and Johnson.

Gordon was nearly catastrophic for the Tribe. *See, e.g.,* Affidavits of Duncan, Terry, F.K. Jones, and Cortinas. In the Permit Area, the Miccosukee Indian Village was under water, the principal tribal road was flooded, and the Indian chickees were inundated. Duncan Aff. at ¶ 10. Many tribal members had to evacuate their homes. Ex. G to Response (Letter from Cortinas to Interior Department Assistant Secretary Bonnie Cohen). The tribal village, which contributes significantly to the Tribe's economic livelihood, was closed to the public. *Id.*

The flooding also devastated the tree islands in WCA 3A. Terry Aff. at ¶¶ 7–11. Blue and green algae covered soil where tribal members traditionally plant their corn and conduct their religious ceremonies. *Id.* at ¶ 8. As a result, tribal members could not engage in the traditional spring planting ceremony in February and March of 1995. *Id.* They also were unable to plant other crops. *Id.* at ¶ 7. The islands and trees were severely damaged, and may not recover for several generations. *Id.* at ¶ 10. More than a foot of water flooded chickees in the islands. *Id.* at ¶ 7.

As with the flooding before Gordon, damage was not limited to tribal land. Numerous other areas in and around Everglades National Park were flooded. Johnson Decl. at ¶¶ 17, 20, 22 (Section 2); Doren Decl. at ¶ 5; Belli Decl. at ¶ 9. More than fifteen inches of water covered much of Shark Valley. Belli Decl. at ¶ 3(a). Park officials had to close it from November 15, 1994, through February 22, 1995. *Id.* They also had to close the Chekika Recreation Area. *Id.* at

---

**7.** A 50–year flood means that a flood of similar magnitude is expected to occur only once every

50 years. Khanal Aff. at ¶ 6.

¶ 3(c). Eleven park employees were forced to evacuate their homes. *Id.* at ¶ 9(e). A number of Park facilities had to be closed to the public, and the Park lost hundreds of thousands of dollars in revenue. *Id.* at ¶ 9.

Many white-tailed deer and other wildlife either drowned or died due to malnutrition. F.K. Jones Aff. at ¶¶ 6–10; Snow Decl. at ¶¶ 3–7. Some experts estimated that eighty-five percent of the deer herd died, and that it will take a decade before the herd regains its pre-flood numbers. F.K. Jones Aff. at ¶ 8. Breeding habits of birds, alligators and other wildlife were threatened, including the endangered Cape Sable Seaside Sparrow. Snow Decl. at ¶ 8; Fleming Decl. at ¶¶ 2–4.

On the same day that Gordon struck, the Tribe held a telephone conference with federal and state officials and renewed its request for emergency flood relief. Duncan Aff. at ¶ 8; Cortinas Aff. at ¶ 10. The Tribe again asked that Park officials authorize cutting the vegetation behind the S–12 structures. *Id.* Defendants Ring and West rejected this idea. *Id.*[8] Tribe officials indicated that West said that "the Tribe had a diminished status and lesser flood protection rights because the land where tribal members lived is a permit area in Everglades National Park." Duncan Aff. at ¶ 8; Cortinas Aff. at ¶ 10; F.K. Jones Aff. at ¶ 4.

As a result of the November 15, 1994 telephone meeting, representatives of the Park, the Bureau of Indian Affairs, the Corps and the District held a conference call on November 17 to discuss solutions to the Tribe's flooding problems. Johnson Decl. at ¶ 13 (Section 1) and ¶ 1 (Section 2). This was one of several telephone meetings held from November 15–18 to discuss flood relief. Belli Decl. at ¶ 5. As a result, the federal government agreed to some Tribe requests: (1) to continue adding fill to raise the elevation of

tribal houses and driveways. (Belli Decl. at ¶ 5(a)); (2) to construct the two temporary berms discussed in Section D *supra (Id.* at ¶ 5(b)); (3) to open two extension canal gates, S–346 and S–347, to improve water flow out of WCA 3A and into the Park (*Id.* at ¶¶ 5(d), 8); and (4) to send two government surveyors and surveying equipment to help determine how to best elevate tribal houses and government buildings (*Id.* at ¶ 7).

On November 18, 1994, tribal attorney Cortinas wrote a five-page letter to Interior Department Assistant Secretary Bonnie Cohen, reiterating the Tribe's requests to open the S–333 gates and cut the S–12 vegetation. Ex. G to Response. On November 21, tribal officials again met with District and Corps representatives. Duncan Aff. at ¶ 11; F.K. Jones Aff. at ¶ 10. The District and the Corps agreed that removing the S–12 vegetation would relieve flooding. *Id.*[9] However, Park officials continued to oppose cutting the vegetation. *Id.*

The S–333 gates were not opened because downstream water levels were too high, according to the Corps' operating criteria. Doren Decl. at ¶ 21 (Section 2); Mierau Aff. at ¶ 10. Water levels at the downstream triggering points did not drop below the mark where the criteria allow the S–333 gates to be opened until March 21, 1995. Doren Decl. at ¶ 21 (Section 2); Mierau Aff. at ¶ 10. Once the gates were opened on March 21, water levels decreased two to three inches within a day. *Id.*

To support its request to cut the S–12 vegetation, the Tribe gave federal officials a 1968 study of plant cutting behind the S–12 structures conducted by the U.S. Geological Survey. Duncan Aff. at ¶ 11. The vegetation cut in 1968 was primarily sawgrass, while the plants that the Tribe wanted cut in 1994 were much more varied. Ex. D to

---

**8.** Several tribal officials indicated that the District and the Corps favored cutting the vegetation. Duncan Aff. at ¶ 8; Cortinas Aff. at ¶ 10; F.K. Jones Aff. at ¶ 4. However, Terry Rice, the Corps' District Engineer, said that neither he nor his employees ever took a position on whether the vegetation should be cut. Rice Decl. at ¶ 4. Rice said he told tribal officials only that cutting the vegetation would increase water flow through the area. *Id.* at ¶ 3.

**9.** Tribal officials indicated that Park authorities were supposed to attend the meeting, but showed up "several hours late." Duncan Aff. at ¶ 11. Park officials said they were never told when the meeting would be held. Belli Decl. at ¶ 6. Two Park officials did meet with Terry and Duncan later the same day. Doren Decl. at ¶ 10.

Duncan Aff.; Duncan Aff. at ¶ 14; David Jones Decl. at ¶ 4.[10] According to the 1968 study, water flow through the S–12 structures temporarily increased by fifteen percent after the Corps cut the plants, but then dropped. Ex. D to Duncan Aff.[11]

The Tribe indicated it would not use herbicides or pesticides to remove the vegetation behind the S–12 structures. Duncan Aff. at ¶ 19. Instead, officials planned to use a mechanical weed harvester that would cut the vegetation just above ground level so as to not disturb the soil. They then planned to recover the plants before they flowed downstream. Id.

Despite these precautions, Park officials turned down the Tribe's request because they feared cutting the vegetation would seriously harm Park water, plants and wildlife. Doren Decl. at ¶ 12; Snow Decl. at ¶¶ 2, 6–12; Fleming Decl. at ¶¶ 2–7; Doren Supp. Decl. at ¶¶ 2–3; Ronald Jones Decl. at ¶¶ 4–8. For example, they thought cutting the vegetation would increase the flow of nutrients downstream, which would pollute Park water. Doren Decl. at ¶ 12; Doren Supp. Decl. at ¶¶ 2–3; Ronald Jones Decl. at ¶¶ 4–8. It could also increase water flow downstream, thereby prolonging flooding in the Park. Snow Decl. at ¶ 2. The higher levels of polluted water could destroy sawgrass marshes and other native plants in the Park. Doren Decl. at ¶ 12; Snow Decl. at ¶ 5. The high water levels also would destroy habitats for alligators, white-tailed deer, the endangered Cape Sable Seaside Sparrow, the endangered Florida Panther and other wildlife. Doren Decl. at ¶ 12; Snow Decl. at ¶ 5. As a result, breeding could be curtailed. Doren Decl. at ¶ 12; Snow Decl. at ¶ 5.

Furthermore, in 1993 Park officials had agreed to a District request to cut vegetation behind S–332, a structure similar to S–12.

Doren Decl. at ¶ 11. District officials had thought that cutting the vegetation would increase water flow from the north into the Park. Id. However, there was no noticeable change in water flow after the District cut the vegetation. Id. But the volume of sediment, plant debris and other pollutants flowing into the Park increased. Id. at ¶¶ 11–12. Park officials thought the same thing would happen if they cut the S–12 vegetation. Id.

## DISCUSSION

### I. THE STANDARD OF REVIEW

A moving party is entitled to summary judgment only where no genuine issue of material fact exists and the party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, a court must view all the evidence in a light most favorable to the non-moving party. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir.1988). All reasonable doubts as to the facts are to be resolved in favor of the party opposing summary judgment. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir.1991). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. Augusta Iron and Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir.1988).

While the burden on a party seeking summary judgment is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). A mere

---

10. The Tribe and Park officials differ on the nature of the plants in question. Duncan Aff. at ¶ 14; David Jones Decl. at ¶ 4. Tribe scientists say that the vegetation is made up of nonnatural plants such as cattails, yellow water lily, Carolina willow, and climbing hempweed. Duncan Aff. at ¶ 14. Park scientists say it is comprised of native plant species such as bayheads, willowheads, pond apple, willow, common cattail, lether fern and spatterdock. David Jones Decl. at ¶ 4.

11. The parties differ on the conclusions to be drawn from this study. The Tribe believes it shows the benefits of cutting vegetation behind the S–12 structures. Duncan Aff. at ¶ 11. The Federal Defendants say that the study was inconclusive at best. Doren Supp. Decl. at ¶ 1.

sliver of evidence in favor of the party opposing the motion, or evidence that is merely colorable or not significantly probative, is insufficient to defeat a properly supported motion. *Id.* Despite the presumption in favor of the non-moving party, the Court must bear in mind that the purpose of Rule 56 is to eliminate the needless delay and expense of unnecessary trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

## II. THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT IS ENTITLED TO ELEVENTH AMENDMENT IMMUNITY

■ The District argues that the Court should grant summary judgment in its favor because it is a Florida state agency, and therefore is entitled to immunity from suit in federal court under the Eleventh Amendment to the United States Constitution. The Court agrees.[12]

■ The Eleventh Amendment bars suits by citizens of a state or foreign country against states in federal court.[13] The states' immunity from suit specifically extends to Indian tribes. *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). The Tribe argues that the Eleventh Amendment does not apply to lawsuits seeking injunctive relief,[14] but case law does not support this contention. The Eleventh Amendment applies to lawsuits seeking injunctive and other equitable relief as well as money damages. *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, ——, 116 S.Ct. 1114, 1124, 134 L.Ed.2d 252 (1996); *Pennhurst State Sch. & Hosp. v. Halderman,*

465 U.S. 89, 100–01, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984).[15]

The Eleventh Circuit Court of Appeals has identified several factors for courts to consider in determining whether a political subdivision such as the District is an arm of the state protected by the Eleventh Amendment: (1) how state law defines the entity, (2) the agency's fiscal autonomy, (3) what degree of control the state maintains over the agency, (4) where the entity derives its funds, and (5) who is responsible for judgments against it. *Robinson v. Georgia Dept. of Transp.,* 966 F.2d 637, 638 (11th Cir.), *cert. denied,* 506 U.S. 1022, 113 S.Ct. 660, 121 L.Ed.2d 586 (1992); *Tuveson v. Florida Governor's Council on Indian Affairs,* 734 F.2d 730, 732 (11th Cir.1984); *Fouche v. Jekyll Island–State Park Auth.,* 713 F.2d 1518, 1520 (11th Cir. 1983). These factors suggest that the District is a state agency.

■ On the first factor, a primary consideration is how state courts have treated the agency. *Tuveson,* 734 F.2d at 732. Florida courts have treated the District as a state agency in determining that it was immune from suit in state court under traditional sovereign immunity principles. *South Fla. Water Management Dist. v. Taylor,* 676 So.2d 11 (Fla. 3d DCA 1996). Turning to the second factor, the fact that an agency submits its budget to the state for approval suggests it is an arm of the state. *Robinson,* 966 F.2d at 638 (Georgia Department of Transportation was entitled to Eleventh Amendment immunity in part because it submitted its budget to the state for approval). In Florida, each of the state's five water management districts must submit its annual

12. The District also argues that the Court should grant summary judgment because the agency shares immunity from suit with the Federal Defendants under the Flood Control Act of 1948. *See* 33 U.S.C. § 702c. The Court does not address issue because of its ruling on the Eleventh Amendment argument.

13. Although by its terms the amendment bars only suits by citizens of one state against another state, the Supreme Court has construed the amendment to bar suits by citizens of a state against their own state government. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

14. The Tribe's lawsuit seeks both damages and an affirmative injunction.

15. The Supreme Court did not, as the Tribe argues, limit Eleventh Amendment immunity to lawsuits seeking damages in *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). The *Hess* Court merely reiterated a long-standing principle that courts must consider whether state treasuries are liable for judgments in determining whether particular agencies are entitled to Eleventh Amendment immunity. 513 U.S. at 47–49, 115 S.Ct. at 404–05.

budget and expense report to the governor, who then may approve or disapprove the budget, in whole or in part. Fla. Stat. §§ 373.507, 373.536(5)(a).

On the third factor, the state exercises a high degree of control over all water management districts. Not only does the governor have final say over their budgets, but state law defines the powers that the districts have, Fla. Stat. §§ 373.103, 373.308, 373.309, and 373.333; state auditors may audit each district's accounts, Fla. Stat. § 373.589; and the state must review and approve all rules that the districts promulgate. Fla. Stat. §§ 373.114, 373.427, and 373.455.

As to the fourth factor, the Tribe correctly notes that under Florida law, the District is authorized to levy *ad valorem* property taxes. The Florida Constitution specifically prohibits state agencies from levying those taxes. *See* Fla. Const. art. VII, § 1. However, Section 9 of Article VII allows agencies to levy *ad valorem* property taxes for water management purposes, and Florida courts have upheld the constitutionality of water management districts levying such taxes. *St. Johns River Water Management Dist. v. Deseret Ranches of Fla., Inc.,* 421 So.2d 1067, 1070 (Fla.1982) (water management districts may levy *ad valorem* taxes even though they serve a state purpose as long as they also serve a local purpose). On the fifth factor, no party has submitted evidence showing whether the state must satisfy judgments against the District.

Thus, the factors that the Eleventh Circuit has identified as important in determining whether an entity is an arm of the state weigh in favor of finding that the District is a state agency. Following *Robinson, Tuveson,* and *Fouche,* this Court finds that for the reasons listed above, the District is entitled to Eleventh Amendment Immunity. *Accord Indian Trails Water Control Dist. v. South Fla. Water Management Dist.,* No. 96–8598–CIV–RYSKAMP (S.D.Fla. Dec. 12, 1996).

■ The Tribe next argues that the District waived any Eleventh Amendment immunity claims by participating in a federal program—operation of the C & SF Project for the Corps. The Tribe relies on *Parden v.*

*Terminal Ry. Of Ala. State Docks Dept.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), for this proposition. *Parden* held that the state of Alabama waived its Eleventh Amendment immunity by acting as a railway employer under a federal law in which Congress authorized lawsuits against *any* participating employer. *Id.* at 194–98, 84 S.Ct. at 1214–16.

The Tribe's reliance on *Parden* is misplaced for two reasons. First, the Supreme Court in *Welch v. Texas Dept. of Highways,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987), overruled *Parden's* holding that states may impliedly consent to suit by participating in federal programs. Under *Welch,* Congress may abrogate the Eleventh Amendment and subject states to lawsuits in federal court only if it does so in unmistakably clear language. *Id.* at 475, 107 S.Ct. at 2947. Second, in *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974), the Supreme Court held that the state of Illinois had not waived its immunity to suit by participating in a federal public aid program: "The mere fact that a State participates in a program through which the Federal Government provides assistance ... is not sufficient to establish consent on the part of the State to be sued in the federal courts." *Id.* at 673, 94 S.Ct. at 1361. Following *Welch* and *Edelman,* the Court finds that the District did not waive its Eleventh Amendment immunity by operating the C & SF Project for the Corps. Accordingly, the Court will grant summary judgment in favor of the District on Counts II, IV, and VI.

## III. THE FEDERAL DEFENDANTS DID NOT BREACH THEIR DUTY OF TRUST TO THE TRIBE

The Court must next decide whether the Federal Defendants are entitled to summary judgment on the Plaintiffs' breach of trust (Count V), due process (Count III), and equal protection (Count I) claims.

■ It is undisputed that there is a general trust relationship between the United States and Native American tribes. *United States v. Mitchell,* 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983). The

Supreme Court has repeatedly emphasized the "distinctive obligation of trust incumbent on the Government in its dealings with these dependent and sometimes exploited people." *E.g., Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). The United States often serves in a fiduciary capacity when dealing with Native Americans, and "as such, it is duty bound to exercise great care in administering its trust." *United States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973).

■ The Tribe, citing these well-established tenets, argues that the Federal Defendants had a fiduciary obligation to accede to its requests to cut the vegetation behind the S–12 structures and open the S–333 gates. However, despite the general trust obligation of the United States to Native Americans, the government assumes no specific duties to Indian tribes beyond those found in applicable statutes, regulations, treaties or other agreements. *Mitchell,* 463 U.S. at 224, 103 S.Ct. at 2971–72 (Tucker Act and accompanying regulations established duty of federal government to manage Indian timber for the benefit of a tribe); *Vigil v. Andrus,* 667 F.2d 931, 934 (10th Cir.1982) ("the federal government generally is not obligated to provide particular services or benefits in the absence of a specific provision in a treaty, agreement, executive order, or statute"); *Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 379 (1st Cir.1975) (rejecting the notion of "some sort of overly general fiduciary relationship, unlimited and undefined," between the Interior Department and the tribe, and holding that "[a] fiduciary relationship ... must indeed be based upon a specific statute, treaty or agreement which helps define and, in some cases, limit the relevant duties"); *Havasupai Tribe v. United States,* 752 F.Supp. 1471, 1486–87 (D.Ariz.1990), *aff'd sub nom., Havasupai Tribe v. Robertson,* 943 F.2d 32 (9th Cir.1991); *cert. denied,* 503 U.S. 959, 112 S.Ct. 1559, 118 L.Ed.2d 207 (1992) ("[i]t is equally clear that the federal govern-

ment is not obligated to provide particular services or benefits, nor to undertake any specific fiduciary responsibilities in the absence of a specific provision in a treaty, agreement, executive order, or statute").

Before determining whether the Federal Defendants violated any fiduciary obligations to the Tribe, the Court must first ascertain what, if any, duties were imposed on the Defendants by the applicable statutes, treaties, regulations and agreements. Only after determining the scope of the government's duties can the Court determine whether the Defendants breached them.

There are several applicable statutes and agreements: the Lease, the Settlement Agreement, the Special Use Permit, the National Park Service Organic Act, the Everglades National Park Act, the C & SF Project, and the various court-approved Corps operating criteria. *See* Sections B and C *supra.* The Tribe has not introduced evidence that the Federal Defendants assumed a duty under any of these statutes and agreements to provide the Tribe with the flood relief it has requested in this case.[16] In contrast, the Federal Defendants have produced evidence showing that according to these statutes and agreements, they had the authority to deny the Tribe's requests to cut the S–12 vegetation and open the S–333 gates.

■ All three areas of tribal land at issue are subject to an applicable statute or agreement giving the Federal Defendants broad discretion to manage the land. For example, the majority of the Federal Reservation and all of the Leased Area are located within WCA 3A, which is part of the C & SF project. Congress gave the Corps broad discretion to manage the C & SF Project. Vearil Decl. at ¶¶ 5, 8. Furthermore, as discussed in Section C *supra,* the Lease and Settlement Agreement subject the Tribe's rights in the Leased Area to the Corps' authority to raise and lower water levels within WCA 3A. Lease at ¶ 6. Thus, the only

---

16. The Tribe states that the Federal Defendants violated their fiduciary duties by deliberately flooding tribal lands. However, the Federal Defendants did not act to flood tribal lands. Excessive rainfall over several months caused the flooding. Rather, it is the Federal Defendants' *inaction*—their refusal to cut the S–12 vegetation and open the S–333 gates—that the Tribe, in reality, disputes.

duty that the Corps assumed towards the Tribe was to manage the area pursuant to its authority under the C & SF. Project and accompanying operating criteria.

The Federal Defendants produced evidence showing that the Corps did not open the S–333 gates until March 21, 1995, because (1) the Corps operating criteria specified that the gates stay closed until water levels downstream had dropped below certain levels, and (2) water did not drop below those levels until March 21. *See* Vearil and Mierau Affidavits, Doren Declaration, and Ex. A to the District's Reply (the 1993 Environmental Assessment). The Tribe offered no evidence to the contrary. Although the Corps' decision may have exacerbated flooding on tribal land, the undisputed evidence shows that it was made in accordance with the WCA 3A operating criteria. Accordingly, the Corps violated no duty towards the Tribe in keeping the S–333 gates closed until March 21, 1995.

■ The Tribe's claims also relate to the Permit Area located along the northern edge of Everglades National Park. As previously noted, the Special Use Permit allowing the Tribe to occupy the 333–acre tract is subject to the applicable federal statutes giving the Park Service discretion in operating the Park. Attach. 15 to Federal Defendants' Proposed Finding of Uncontroverted Fact at 22. In addition, because the S–12 structures are located in Everglades National Park, the Park Service had to approve or deny the Tribe's request to cut the vegetation. The Everglades National Park Act prioritizes preserving the Park's natural, wilderness-like state, including its unique flora and fauna. 16 U.S.C. § 410c. The Act also incorporates the general purposes of the National Park Service Organic Act, which makes conserving scenery, nature and wildlife the main goal of all national park management. 16 U.S.C. § 410b, 16 U.S.C. § 1. The Everglades Act provides for the rights of the Miccosukee Indians by stating that nothing in the Act "shall be construed to lessen any existing

rights of the Seminole Indians *which are not in conflict with the purposes for which the Everglades National Park is created."* 16 U.S.C. § 410b (emphasis added). The emphasized language qualifies the Tribe's rights by giving priority to overall management of the Park.

■ In addition to the Everglades Act's limits on the Tribe's rights in the Park, the Interior Department has broad discretion in determining how best to protect public lands, weigh competing uses of federal property, and allocate park resources. *Organized Fishermen of Fla. v. Hodel,* 775 F.2d 1544, 1550 (11th Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986); *Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1454 (9th Cir.1996); *Sierra Club v. Andrus,* 487 F.Supp. 443, 448 (D.D.C. 1980), *aff'd sub nom., Sierra Club v. Watt,* 659 F.2d 203 (D.C.Cir.1981). Therefore, under the applicable laws, the only duty the Park Service had to the Tribe was to uphold its rights insofar as they did not conflict with overall park purposes.

The Federal Defendants produced evidence showing that removing the S–12 vegetation could harm Park water quality, plants, and wildlife. Again, the Tribe has produced no evidence to the contrary.[17] Congress authorized the Park Service to weigh competing interests when it set forth Park purposes and Seminole Nation rights in the Everglades Act. Under very similar circumstances, the Supreme Court held that the United States did not breach a fiduciary duty to another Indian tribe. *See Nevada v. United States,* 463 U.S. 110, 128, 103 S.Ct. 2906, 2917, 77 L.Ed.2d 509 (1983) (the government did not breach any fiduciary duty to the Paiute Tribe when it represented both tribal and water management district's interests in a water rights lawsuit: "The Government cannot follow the fastidious standards of a private fiduciary, who would breach his duties to his single beneficiary solely by representing potentially conflicting interests

17. The affidavit of Truman Duncan stating that "I ... am convinced that the vegetation removal would have no adverse water quality impact on Everglades National Park," does not raise a factual issue sufficient to avoid summary judgment.

A mere sliver of evidence is insufficient to defeat a properly supported summary judgment motion. *Anderson supra,* Section I, 477 U.S. at 252, 106 S.Ct. at 2512.

without the beneficiary's consent. The Government does not compromise its obligation to one interest that Congress obliges it to represent by the mere fact that it simultaneously performs another task for another interest that Congress has obligated it by statute to do.").

In this instance, Congress mandated that the Park Service weigh tribal and Park interests. Given Park officials' mandate to protect park resources, their broad discretion to carry out the mandate, and their concern that cutting the S–12 vegetation would harm water quality, plants and wildlife, the decision not to cut the vegetation breached no duty towards the Tribe. Accordingly, the Court will grant summary judgment in favor of the Federal Defendants on Count V.

## IV. THE FEDERAL DEFENDANTS HAVE NOT VIOLATED THE PLAINTIFFS' DUE PROCESS RIGHTS

The Plaintiffs claim the Federal Defendants violated their right to due process of law under the Fifth Amendment to the U.S. Constitution. They assert violations of two specific rights: to enjoy their tribal lands and to freely practice their religion under the First Amendment to the Constitution. The Court will address each argument in turn.

### A. The Right to Enjoy Tribal Lands

■ To succeed on this claim, the Plaintiffs must show that the Federal Defendants deprived them of a constitutionally protected property interest for an improper motive and by arbitrary, capricious and pretextual means. *Reserve, Ltd. v. Town of Longboat Key*, 17 F.3d 1374, 1379 (11th Cir.1994), *cert. denied*, 513 U.S. 1080, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995). Therefore, the first question the Court must determine is whether the flood relief the Plaintiffs seek in this case is a constitutionally protected property interest.

■ Property interests may be created by the Constitution itself. *Wright v. Lovin*, 32 F.3d 538, 540 (11th Cir.1994). They also may be created by independent sources, such as state or federal law, and contracts or unwritten agreements among parties. *Board*

*of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). To have a property interest in a benefit, a person must have more than a need for or expectation of it. *Id.* He must have a legitimate claim of entitlement to it. *Id.* In addition, the Due Process Clause of the Fifth Amendment generally confers no *affirmative* right to government aid, even where such aid may be necessary to secure life, liberty, or property interests. *DeShaney v. Winnebago County Dept. of Soc. Serv.*, 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). Rather, the Clause acts as a *constraint* on governmental power to act. *Id.*

■ As discussed in Note 19 *supra*, the Tribe asserts that the Federal Defendants failed to act to provide flood relief to its members. To support its claim that this violated a property interest, the Tribe argues that this case falls into a narrow exception to the general rule that the Due Process Clause puts no burden on the government to take action. In certain limited circumstances, by virtue of a special relationship between the government and a party, the Constitution imposes affirmative duties of care and protection on the government. *E.g., DeShaney*, 489 U.S. at 198, 109 S.Ct. at 1004–05; *Wooten v. Campbell*, 49 F.3d 696 (11th Cir.), *cert. denied*, — U.S. ——, 116 S.Ct. 379, 133 L.Ed.2d 302 (1995).

The Tribe contends that by virtue of the general trust relationship between the United States and Native Americans, it and the government have the type of special relationship that imposes affirmative obligations on the Federal Defendants. This is the same argument the Tribe made to support its breach-of-trust claim. As discussed in Section III *supra*, the general trust relationship does not give rise to an affirmative duty by the government to act. The only duties the Federal Defendants assumed were those delineated by the applicable laws and agreements. As discussed above, those laws and treaties imposed no obligation on the Defendants to open the S–333 gates and cut the S–12 vegetation.

In addition, the special relationship exception applies only to *liberty* interests, not *property* interests. The special relationship that forces the government to act applies only in situations where the government has taken a person into custody and has deprived him of the ability to care for himself. *DeShaney,* 489 U.S. at 199–200, 109 S.Ct. at 1005–06. Under those circumstances, the government assumes some responsibility to provide for that person's safety and general well-being. *Id.* However, the special relationship has been narrowly construed. *See Collins v. City of Harker Heights,* 503 U.S. 115, 127–28, 112 S.Ct. 1061, 1069–70, 117 L.Ed.2d 261 (1992), *citing Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (government must satisfy certain minimal standards for pretrial detainees); *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (same for persons confined in mental institutions); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (same for convicted felons).

The Tribe has not alleged, nor has the evidence shown, that the Federal Defendants so restrained tribal members' liberty that they were unable to care for themselves. Furthermore, the Tribe has not pointed to any authority standing for the proposition that a property interest may give rise to a special relationship of this type. Therefore, the Tribe has not asserted a property interest that would impose an obligation on the Federal Defendants to open the S–333 gates or cut the S–12 plants. Accordingly, there was no due process violation.

### B. The Freedom of Religion Claim

The Plaintiffs' claim on this count is that by failing to alleviate flooding in the Leased Area, the Federal Defendants infringed on the Tribe's First Amendment right to freely practice its religion. Specifically, the Tribe argues that it was unable to engage in its traditional spring corn-planting ritual because tree islands in the Leased Area were flooded.

The Tribe argues that the government's actions in this case should be subject to the strict scrutiny test of *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Under that test, the government must have a compelling interest in its actions that overrides a party's right to freely practice its religion. However, before applying the strict scrutiny test, the Court must first determine whether the government's actions interfered with the Tribe's ability to practice its religion. *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 448–50, 108 S.Ct. 1319, 1324–26, 99 L.Ed.2d 534 (1988). The Court concludes that the government did not interfere with the Tribe.

Under the Free Exercise Clause of the First Amendment, the government may not pass laws or take action that directly or indirectly coerce individuals into giving up religious practices. *Lyng,* 485 U.S. at 450–51, 108 S.Ct. at 1326. Nor can the government penalize individuals for attempting to practice their religion. *Id.* However, the Federal Defendants have not engaged in either practice. They did not attempt to penalize any tribal members who wished to undertake the spring corn planting ritual, nor take any action to pressure Tribe members into giving up the rite.

Viewing the facts in the light most favorable to the Tribe, as the Court must on a summary judgment motion, it appears that the government's failure to cut the S–12 vegetation and open the S–333 gates indirectly burdened the Tribe's ability to practice its religion in the Leased Area. Under the Supreme Court's holding in *Lyng,* this does not require the Federal Defendants to justify their actions: "[The Free Exercise Clause] cannot and does not imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions." *Lyng,* 485 U.S. at 450–51, 108 S.Ct. at 1326. In other words, the First Amendment does not require the government to assist any group in the exercise of its religion. *Id.* at 451, 108 S.Ct. at 1326.

In *Lyng,* three Native American tribes challenged the U.S. Forest Service's decision

to build a road across federal land that the tribes had historically used for religious worship. According to the complaint, construction would have interfered with the sanctity and tranquility necessary for worship. *Id.* at 442–43, 108 S.Ct. at 1321–22. The Supreme Court held that the government's decision to build the road was not an action that coerced the tribes into giving up their religious beliefs or penalized them for attempting to exercise those beliefs. *Id.* at 449, 108 S.Ct. at 1325. Citing *Bowen v. Roy,* 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), the Court found that "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with religious beliefs of particular citizens." *Lyng,* 485 U.S. at 448, 108 S.Ct. at 1325 (internal quote marks omitted). The Court went on to state that "the Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.* (internal quote marks and citations omitted).

*Lyng* is directly applicable here. As in *Lyng,* the government in this case took lawful actions to protect Park resources from harm. *See* Sections III and IV(A) *supra.* The fact that those actions burdened the Tribe's religious practice is not sufficient to require the government to provide a compelling justification. *See also Sequoyah v. Tennessee Valley Auth.,* 620 F.2d 1159 (6th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980) (government decision to flood tribal lands for reservoir did not infringe on Cherokee Tribe's First Amendment rights).

The Tribe attempts to distinguish *Lyng* and *Sequoyah* by arguing that the Plaintiffs in those cases had no property rights to the land in question, whereas it does. But as the Court has already found, the Tribe's property rights were subject to the Federal Defendants' lawful authority to manage federal lands and operate the federal water management project. And as this Court held in its Preliminary Injunction Order and reiterated above, the Tribe long ago ceded any aboriginal title claims to the land. Thus, the Tribe's attempt to distinguish *Lyng* and *Sequoyah* on the basis of property rights fails. Because the Court finds that the Federal Defendants violated no due process rights of the Plaintiffs, the Court will grant summary judgment in favor of the Federal Defendants on Count III.

## V. THE TRIBE'S EQUAL PROTECTION CLAIM FAILS

 The Tribe asserts that the Federal Defendants violated its right to equal protection of the laws under the Fifth Amendment to the U.S. Constitution.[18] because the Tribe is a discrete and insular minority adversely impacted by the Defendants' decisions. Again, the Tribe argues that the government's actions are subject to strict scrutiny, and that the Federal Defendants must present compelling reasons to justify their decisions not to cut the S–12 vegetation and open the S–333 gates. However, before the Court applies strict scrutiny, it must first determine whether the government's decisions had a discriminatory purpose. *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976).

 On their face, the statutes and operating criteria the Federal Defendants used in deciding not to grant the two requests at issue are racially and ethnically neutral. That is, by their language, they do not require the government to discriminate against any particular group or individuals. The fact that a facially neutral law has a discriminatory impact does not alone trigger equal protection analysis. *Id.; Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292–93, 60 L.Ed.2d 870 (1979). The neutral law or policy is only unconstitutional if it can be shown to have a discriminatory purpose. *Feeney,* 442 U.S. at

**18.** The Equal Protection Clause is part of the Fourteenth Amendment, which is enforceable only against the states. However, the Supreme Court has held that the Fifth Amendment contains an equal protection component preventing the United States from invidiously discriminating between individuals and groups. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

272, 99 S.Ct. at 2292–93. Discriminatory purpose implies more than awareness of the consequences of an act. *Id.* at 279, 99 S.Ct. at 2296. It implies that the decision maker "selected or reaffirmed a particular course of action at least in part 'becausue of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* The Court may infer discriminatory purpose from the totality of the circumstances, including *systematic* unequal application of a facially neutral law. *Davis,* 426 U.S. at 241–42, 96 S.Ct. at 2048–49 (emphasis added).

The Tribe has produced evidence showing that the Federal Defendants' decisions adversely impacted them by prolonging flooding on tribal land. However, it has not produced evidence showing that the Defendants made their decisions *because* they would prolong that flooding. The Tribe in its Response cites the following evidence as alleged proof of discriminatory purpose: Exhibit D at Paragraphs 8 and 11, Exhibit F at Paragraphs 4–12, Exhibit J at Paragraph 4, and Exhibit K at Paragraph 4. Paragraphs 4 of Exhibits J and K, Paragraph 8 of Exhibit D and Paragraph 10 of Exhibit F are identical:

> On November 15, 1994, I attended and participated in a telephonic conference between the Tribe and state and federal agencies to address the Tribe's flooding crisis. During the phone conference, the U.S. Corps of Engineers and the South Florida Water Management District stated that they favored removal of the vegetation along the S–12 structures. The Superintendent of Everglades National Park, Richard Ring, rejected this proposal. Barbara West supported Ring's refusal and added that the federal government's obligation was to Everglades National Park and not to the Miccosukee Tribe. Ms. West also remarked that the Tribe had a diminished status and lesser flood protection rights because the land where tribal members lived is a permit area in Everglades National Park.

The remaining paragraphs recite the Park Service's decisions to deny the Tribe's requests, despite the fact that several other agencies favored them.

This evidence does not raise a genuine factual issue on the subject of discriminatory purpose. The Federal Defendants have produced evidence showing non-discriminatory reasons for denying the Tribe's requests. *See* Section E *supra.* The Tribe has not shown that these reasons were a pretext for discrimination. West's statements do not prove an intent to discriminate. They merely recognize that the Tribe's property rights in this case are subject to the Park Service's duties to protect Park resources. See Sections III and IV(A) *supra.* Without a showing of discriminatory purpose, the Tribe cannot establish an equal protection violation. *Davis,* 426 U.S. at 242, 96 S.Ct. at 2048–49. Therefore, the Court will grant the Federal Defendants' summary judgment motion on Count I.

### CONCLUSION

For the foregoing reasons, the Tribe is not entitled to a Writ of Mandamus. Therefore, the Court also will grant summary judgment in favor of all defendants on Count VI. Accordingly, it is

ORDERED AND ADJUDGED that the Federal Defendants' Motion for Summary Judgment (D.E.# 45) is **GRANTED.** It is

FURTHER ORDERED AND ADJUDGED that Defendant South Florida Water Management District's Motion for Final Summary Judgment (D.E.# 51) is **GRANTED.** It is

FURTHER ORDERED AND ADJUDGED that the Motions of Individual Defendants West and Ring for Summary Judgment (D.E.# 47) are **DENIED AS MOOT.** It is

FURTHER ORDERED AND ADJUDGED that the Plaintiffs' Motion for Leave to File a Memorandum of Law (D.E.# 110) is **GRANTED.** It is

FURTHER ORDERED AND ADJUDGED that the Plaintiffs' Motion to Strike Notice of Filing (D.E.# 111) and the Plaintiffs' Motion to Foreclose Summary Judgment on the issue of Eleventh Amendment Immunity (filed July 8, 1997) are both **DENIED.** It is

FURTHER ORDERED AND AD-JUDGED that the Federal Defendants' Motion to Strike Supplemental Affidavit of Truman Duncan (filed July 14, 1997) and the South Florida Water Management District's Motion to Strike Opposition Memorandum (D.E.# 102) are both **DENIED.**