[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-14271
_____

D.C. Docket No. 1:08-cv-23001-KMM

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,
a federally-recognized Indian Tribe,

Plaintiff - Appellant,

versus

UNITED STATES OF AMERICA,
U.S. ARMY CORPS OF ENGINEERS,
SECRETARY OF THE ARMY,
in his official capacity,
LT. GENERAL ROBERT VAN ANTWERP,
Chief of Engineers, U.S. Army Corps of Engineers,
in his official capacity,
BG. GENERAL JOSEPH SCHROEDEL,
Division Engineers,
in his official capacity, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 15, 2013)

Before TJOFLAT and MARTIN, Circuit Judges, and DAWSON,[*] District Judge.

TJOFLAT, Circuit Judge:

Since 1995, the Miccosukee Tribe of Indians of Florida ("Tribe" or "Miccosukee tribe") has had a running battle with the federal government over the government's management of the Central and Southern Florida Project for Flood Control ("C&SF Project") in the Everglades. This case is the most recent chapter.[1] The gist of the four-count complaint the Tribe filed in this case is that the project diverts excessive flood waters over tribal lands—in part to protect other land owners whose properties are located within the project. The District Court dismissed three of the complaint's counts for failure to state a claim for relief and the fourth on summary judgment. The Tribe appeals these decisions. We affirm.

To place the Tribe's claims in full context, we describe the genesis of the C&SF Project, the nature of the Tribe's rights of occupancy in the Everglades, and the manner in which the government's management of the project affects the Tribe's rights.

I.

---

[*] The Honorable Robert T. Dawson, District Judge, United States District Court for the Western District of Arkansas, sitting by designation.

[1] Miccosukee Tribe of Indians of Fla. v. United States, 163 F.3d 1359 (11th Cir. 1998) (unpublished table decision); Miccosukee Tribe v. United States, 103 F. App'x 666 (11th Cir. 2004) (unpublished table decision); Miccosukee Tribe of Indians of Fla. v. United States, 509 F. Supp. 2d 1288 (S.D. Fla. 2007); Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257 (11th Cir. 2009); Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Engineers, 619 F.3d 1289 (11th Cir. 2010).

The unique ecology of the Everglades is at the heart of the events surrounding this case. Beginning at Lake Okeechobee and running to the southern tip of Florida at Florida Bay, the Everglades is "not quite land and not quite water, but a soggy confusion of the two." Michael Grunwald, The Swamp: The Everglades, Florida, and the Politics of Paradise 9 (2006). The natural terrain of the Everglades slopes southward in a "vast sheet of shallow water spread across a seemingly infinite prairie of serrated sawgrass." Id. Aside from an occasional island of trees, it consists entirely of water, grass, wildflowers, and lily pads. Much of the water in the Everglades derives from Lake Okeechobee. The lake does not have a traditional outlet, such as a river, and overflows frequently from summer storms. As a result, the waters flood across Florida's southern terrain in an expansive sheet to form the Everglades.

Through the mid-nineteenth century, the Everglades was virtually uninhabited and unused because of its surplus water and sodden topography. In 1848, Congress proposed to drain the overflowed lands in southern Florida to promote agricultural interests in the state. Id. at 64-67. It eventually passed the Swamp and Overflowed Lands Act of 1850, which conveyed the Everglades and surrounding overflowed areas to the State of Florida for development. 31 Stat. 519 (1850). It took until the early 1900s for development in the Everglades to finally take shape. By 1926, six canals had been constructed from Lake Okeechobee, as

3

well as a dike that ran along the southern end of the lake.  Grunwald, supra, at 106.

Spurred by the promise of a controlled Everglades, people began to move to South

Florida coastal communities, including Miami, in large numbers.  Id. at 172.

But the Everglades was not yet tamed.  Extreme drought, followed by

devastating floods in 1926, 1928, and 1947, revealed that the challenges of water

management in the Everglades were too complex for state and local agencies to

address alone.  Record, no. 128-5, at 14.  The system of canals, levees, locks, and

dams created by the State of Florida were simply not up to the task of adequately

protecting against future disaster.

The federal government intervened.[2]  Through the Flood Control Act of

1948, Congress enlisted the United States Army Corps of Engineers ("Corps") to

partner with state and local agencies in Florida to implement the C&SF Project.[3]

The project is an elaborate network of water control structures spanning thousands

of miles, including canals, levees, pumping stations, gates, and dams.  At its

---

[2] Congress's authority to exercise power over the waters of the Everglades is found in the Commerce Clause.  U.S. Const. art. I, § 8; see Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 193, 6 L. Ed. 23 (1824) (holding that Congress has the authority under the Commerce Clause to regulate navigable waters); Kaiser Aetna v. United States, 444 U.S. 164, 174, 100 S. Ct. 383, 389–90, 62 L. Ed. 2d 332 (1979) ("[C]ongressional authority over the waters of this Nation does not depend on a stream's 'navigability.' [Congress's power is] best understood when viewed in terms of more traditional Commerce Clause analysis than by reference to whether the stream in fact is capable of supporting navigation or may be characterized as 'navigable water of the United States.'").

[3] Pub. L. No. 80-858, 62 Stat. 1171, 1176 (1948); see Flood Control Act of 1954, Pub. L. No. 83-780, 68 Stat. 1256 (1954) (renewing and extending the project); Flood Control Act of 1968, Pub. L. No. 90-483, 82 Stat. 739 (1968) (same).

4

inception, the C&SF Project serviced two constituencies: the agricultural areas immediately south of Lake Okeechobee and the residential and privately-owned areas east of the Everglades.  Later, Congress dedicated the C&SF Project to a third constituency, Everglades National Park, to preserve the Park's ecosystem and protect its endangered species.  Currently, the C&SF Project encompasses two primary objectives: preserving the Everglades and providing water supply and flood protection to South Florida.  Miccosukee Tribe of Indians of Fla. v. United States, 980 F. Supp. 448, 454 (S.D. Fla. 1997).

The operational area of the C&SF Project is massive, comprising 16,000 square miles.  The project stretches from the Kissimmee River Basin, just south of Orlando, to the southern tip of Florida, at Everglades National Park.  To aid in administering this vast system, the Corps has divided the Everglades into three areas: the Everglades Agricultural Area, the Water Conservation Area, and the Everglades National Park.  These areas are contiguous and follow one after another, beginning at Lake Okeechobee and proceeding southward.

The northernmost area is called the Everglades Agricultural Area.  As the name suggests, it is used for farming and other agricultural purposes.  With the Okeechobee Lake immediately to its north, the Everglades Agricultural Area begins along the south and southwest borders of the lake.  The area is about the size of Rhode Island and is surrounded on each of its sides by a canal.  It also has

5

four canals running south and southwest through its center.  Prior to the C&SF Project, the land was commercially useless.  With the help of the project's canals, water gates, and pump systems, the land is kept drained and cultivable.

The second area is called the Water Conservation Area ("WCA"), a grassy expanse to the south and east of the Everglades Agricultural Area consisting mostly of marshland.  The WCA is composed of three reservoirs: WCA 1, WCA 2, and WCA 3.  These reservoirs are interconnected by gate structures and channels that link to the water control systems in the Everglades Agricultural Area, such that water flows from the Everglades Agricultural Area into WCA 1, from WCA 1 into WCA 2, and from WCA 2 into WCA 3.  The depth of the WCA marshland fluctuates based on whether the Corps is storing water in the WCA reservoirs or allowing water to flow south into Everglades National Park.  Altogether the WCAs cover 1,350 square miles across Dade, Broward, and Palm Beach counties.

Immediately to the south of the WCA lies the third area of the C&SF Project, Everglades National Park.  The park is home to twenty-three endangered or threatened species.  According to the Everglades National Park Act of 1934, the park must be "permanently reserved as a wilderness, and no development of the project or plan for the entertainment of visitors shall be undertaken which will interfere with the preservation of the unique flora and fauna and the essential primitive natural conditions now prevailing in this area."  Pub. L. No. 73-267, § 4,

6

48 Stat. 816, 817. Using the gates and pumps in the canals to the north, the Corps is able to maintain and regulate the ecosystem within the park by controlling how much water enters it and from what locations.

The WCA reservoirs are the lynchpin of the Corps's water management system. They function as the water depository for the entire C&SF Project. By manipulating the water levels in the reservoirs, the Corps can regulate the hydrologic conditions in all three sections of the Everglades. Operations in the WCA, therefore, are critical to providing water to Everglades National Park, irrigating agricultural areas during times of drought, absorbing water from farms and cities during storms, and recharging South Florida's aquifers. Grunwald, supra, at 222-23.

This appeal concerns the canal gates at the south end of WCA 3 and the environmental factors that have influenced their operation. WCA 3 is split into two subsections, WCA 3A and WCA 3B. They are separated by a pair of canals, L-67A and L-67C, that run south from WCA 3 into Everglades National Park. WCA 3A comprises nearly all of WCA 3, while WCA 3B consists of only a small part of the southeast corner of the reservoir. Inside the canal that forms the southern border of WCA 3A is a series of gates. From west to east, they are: S-12A, S-12B, S-12C, and S-12D (collectively, the "S-12 gates"). The S-12 gates control the water flow from WCA 3A into the western portion of Everglades

7

National Park. Record, no. 128-5, at 16. The Corps takes into account a variety of considerations when determining how best to manage water flow throughout the Everglades. These considerations influence decisions about the water levels in the WCA reservoirs and when the S-12 gates should be opened and closed. This suit raises questions about the propriety of the Corps's water management decisions regarding the operation of the S-12 gates and the nature and source of that authority.

A.

The C&SF Project established a partnership between the United States and the State of Florida. The United States agreed to furnish money, expertise, materials, and personnel to assist in the construction and operation of a comprehensive flood control system within Florida. The State of Florida in turn agreed to provide the United States with

> all lands, easements, and rights-of-way; make a cash contribution of
> 15 percent of the estimated construction cost for each part of the work
> prior to its initiation . . . ; [] furnish assurances satisfactory to the
> Secretary of the Army that [the State of Florida] will hold and save
> the United States free from damages due to the construction and
> operation of the works[; and] maintain and operate all the works after
> completion in accordance with regulations prescribed by the Secretary
> of the Army, except [among other areas] the main spillways of the
> conservation areas [which will remain under control of the Corps].

Comprehensive Report on Central and Southern Florida for Flood Control and Other Purposes, H.R. Doc. No. 643, 80th Cong., 2d Sess., at 5 (1948).

8

In 1949, the Florida Legislature accepted this proposal and created the Central and Southern Florida Flood Control District by special act to serve as the local sponsor for the C&SF Project.[4]  The District was later renamed the South Florida Water Management District ("SFWMD").[5]  The SFWMD is authorized to facilitate the implementation of the C&SF Project, which includes (1) acquiring fee title or easements by eminent domain for C&SF Project initiatives, (2) acting as local sponsor and liaison for the Corps, and (3) operating and maintaining various sections of the C&SF Project pursuant to regulations issued by the Corps.  Fla. Stat. § 373.1501.

Though the SFWMD currently has a substantial operational role in the C&SF Project,[6] during the C&SF Project's earliest stages, its role primarily involved (1) obtaining easements on various lands within the Everglades on behalf of the State of Florida and (2) granting the Corps permission to construct water

---

[4]  See Fla. Stat. § 373.1501 (originally enacted as Law of June 10, 1949, ch. 25270, § 2, 1949 Fla. Laws (repealed 1972)); Cent. and S. Fla. Flood Control Dist. v. Wye River Farms, Inc., 297 So.2d 323, 329 (Fla. Dist. Ct. App. 1974) (describing the authority granted by the Florida legislature to the Central and Southern Florida Flood Control District as informed by House Document 643).

[5]  The SFWMD has jurisdiction over sixteen counties, encompassing Broward, Collier, Lee, Charlotte, Hendry, Highlands, Glades, Martin, Miami-Dade, Monroe, Okeechobee, Orange, Osceola, Palm Beach, Polk, and St. Lucie counties.  The District is directed by a nine-member governing board, which sets the agency's policies. Governing board members are appointed by the Governor and confirmed by the Florida Senate to serve four-year terms.  Fla. Stat. § 373.073.

[6]  See infra note 7.

9

structures on the lands burdened by these easements.  As a Florida District Court of Appeal described this process,

> [the SWFMD] is the local agency or instrumentality of the State charged with the duty of acquiring the lands necessary for the project. Upon acquisition, by negotiation and purchase or condemnation, [the SWFMD] certifies to the United States Army Corps of Engineers that it has so acquired the necessary title and that the Corps of Engineers may proceed with its obligation of construction of the project. . . . Upon completion of the construction, the Corps of Engineers turns the project back to [the SWFMD] for continued operation and maintenance on behalf of the State of Florida.

Cent. and S. Fla. Flood Control Dist. v. Wye River Farms, Inc., 297 So.2d 323, 329-30 (Fla. Dist. Ct. App. 1974).

Though the Corps and the SFWMD work together to operate and maintain the water management structures created under the C&SF Project, the Corps exercises operational control over critical points within the system.  The Corps directly manages Lake Okeechobee, its major outlets, and the main spillways for the WCA reservoirs, including the S-12 gates.  The SFWMD operates the remainder of the structures in accordance with regulations issued by the Corps.[7]

---

[7] See Appellee Mem. in Resp. to Ct.'s Letter of August 16, 2012 at 14, ECF No. 84 (Circuit Docket) ("The project features to be operated and maintained by the Corps of Engineers are . . .  the main spillways of the water conservation areas [including the S-12 Gates]. . . . The [SFWMD] is responsible for operation and maintenance of all project facilities not operated and maintained by the Corps of Engineers . . . .").  The SFWMD's operations and maintenance staff operate this portion of the C&SF Project's canals, levees, pumps, gates, and culverts from its West Palm Beach headquarters and eight field stations.  The SFWMD coordinates these water control operations on a daily basis with the Corps.  Record, no. 129-5, at 6.

The SFWMD also provides the Corps with early warnings about potentially hazardous conditions.  It is charged with monitoring groundwater levels, canal levels, and rainfall.  If these

10

Despite the Corps exercising control over these systems, either directly or by issuing regulations to the SFWMD, the project is a function of state authorization. The federal government's initiation of the project was premised on the State of Florida's permission; all title to the easements and rights-of-way upon which the C&SF Project structures operate belong to the State of Florida; and the Corps administers the C&SF Project pursuant to an agreement between the United States and the State of Florida. That being said, the Corps is the principal organization charged with overseeing the project and maintains the lion's share of decisionmaking responsibility. It is to that decisionmaking process that we now turn.

## B.

Because of the operational complexity and varied purposes of the C&SF Project, Congress has delegated broad decisionmaking authority to the Corps to operate it.[8] Pursuant to this authority, the Corps promulgates water regulation

---

conditions indicate a strong likelihood of flooding, the SFWMD will recommend that the Corps initiate pre-storm operations. The Corps will review the data, advise the Everglades National Park and the Fish and Wildlife Service, consult with the Miccosukee tribe, and then make a decision to alter system-wide operations from those established in the water regulation schedule. Record, no. 129-7, at 14.

The SFWMD is also in charge of overseeing that the C&SF Project is as consistent with Florida water regulations as possible. When the SFWMD determines that water quality benefits may be achieved in the C&SF Project area without significant impact on achieving the project's authorized purposes, it may petition the Corps for changes in flood control and navigation regulations. Record, no. 128-6, at 19.

[8] See e.g., Comprehensive Everglades Restoration Plan, Pub. L. No. 106-541, Title VI, § 601(c)(1), 114 Stat. 2572, 2683 (2000) ("[T]he Secretary [of the Interior] may implement

schedules that set time periods for when certain channels and gates should be opened or closed. The Corps also sets maximum and minimum ranges for water levels within various portions of the C&SF Project water system. The Corps creates these schedules according to the authorized purposes of the C&SF Project.[9] The schedules provide operational guidelines for the Corps and SFWMD staff that operate the pumps, gates, and other structures that control the inflow and outflow of water throughout the WCA.

In accordance with its regulations, the Corps is permitted to deviate from the water regulation schedules in certain circumstances. For example, if a forest fire threatens the habitat of an endangered species, such as the Cape Sable seaside sparrow, the Corps "will coordinate with the [Fish & Wildlife] Service and seek a deviation from the WCA-3A regulation schedule to ameliorate impacts to the Cape Sable seaside sparrow habitat, as necessary." Record, no. 129-8, at 36. The Corps may also implement changes to the gate schedules if, after consultation with the

modifications to the Central and Southern Florida project that . . . will produce a substantial benefit to the restoration, preservation and protection of the South Florida ecosystem."); Experimental Program of Water Deliveries to Everglades National Park, Pub. L. No. 98-181, § 1302, 97 Stat. 1153, 1292-93 (1983) ("The Secretary of the Army is authorized . . . to modify the schedule of delivery of water from the central and southern Florida project to the Everglades National Park.").

[9] The authorized purposes for the C&SF Project include: (1) absorbing water for flood control; (2) maintaining water supplies for agricultural irrigation, municipalities, and industry; (3) restoring hydrologic conditions in the Everglades National Park; (4) controlling regional groundwater; (5) ensuring water quality; (6) maintaining fish, wildlife, and marsh vegetation; and (7) enhancing the availability of recreational areas within the Everglades. Record, no. 128-6, at 8, 13.

Tribe Chairman, the District Commander of the Corps deems a schedule alteration appropriate to secure the health or safety of the Tribe.[10]  In addition to these deviation protocols, the schedules themselves often set ranges—not exact amounts—for water levels within various C&SF Project basins, reservoirs, and other structures.  The Corps thus has a degree of discretion with which it can adjust water levels within the ranges provided in the published schedules.[11]  These measures provide the Corps operational flexibility to better respond to adverse circumstances in case of drought, flooding, or other environmental disaster.

When setting a water regulation schedule, the Corps is required to abide by the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. §§ 1531–1544.  Under § 7(a) of the ESA, the Corps is required to ensure that its water regulation schedules are not likely to jeopardize the continued existence of any endangered species.  Id. § 1536(a)(2).  The ESA makes it unlawful for any person—including the

---

[10]  The Corps's water regulation schedule defines the procedure for making water level adjustments based on the concerns of the Miccosukee tribe as follows:

> The Chairman of the Miccosukee Tribe . . . will monitor the conditions in WCA-3A and other tribal lands and predicted rainfall.  If the Tribe determines these conditions indicate jeopardy to the health or safety of the Tribe, the Chairman will make a recommendation to the Corps to change the operations of the S-12 structures or other parts of the system.  The Corps will review the data and advise appropriate agencies of the conditions, and the District Commander will personally consult with the Chairman prior to making a decision whether to implement changes to the S-12 operations.

Record, no. 129-7, at 14.

[11]  See e.g., Record, no. 129-7, at 11 (describing the ranges for the reservoir designated "Angel well" as: "[i]f Angel's well is 5.5-6.0 feet, S-331 avg. daily is between 5.0-4.5 [feet]").

13

Corps[12]—to "take" any endangered species of fish or wildlife designated pursuant to 16 U.S.C. §1534(a)(1). To "take" a species includes to "harm" it, id. § 1532(19). "Harm" is defined to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3(c) (2006).

To comply with the ESA, the Corps consults with the Fish and Wildlife Service ("FWS") to ensure its water schedules are not "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of a habitat designated critical to an endangered species.[13] 16 U.S.C. § 1536(a)(2). If the proposed schedule may adversely modify[14] an endangered species or its habitat, the FWS will prepare a biological opinion discussing whether the retention or release of water ordered by the schedule will likely jeopardize the species or its habitat, and, if so, whether a

---

[12] "The term 'person' means . . . any officer, employee, agent, department, or instrumentality of the Federal Government [or] any State." 16 U.S.C. § 1532.

[13] "Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (2009) (emphasis added).

[14] "[A]dverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." 50 C.F.R. § 402.02 (emphasis added).

14

"reasonable and prudent alternative" to the proposed schedule exists. 50 C.F.R. § 402.02. Where the schedule is unlikely to jeopardize an endangered species or its habitat but might result in some harm, the FWS will issue an "incidental take" statement. Id. A taking that is executed in compliance with an "incidental take" statement does not violate the ESA. 16 U.S.C. § 1536.

The Cape Sable seaside sparrow was listed as an endangered species in 1967. It lives in and around Everglades National Park. We have encountered this frail bird before and have had the opportunity to describe its plight.

> The fragility of the sparrow as a species stems from two of its attributes. It has a short lifespan, and its nesting success depends on specific kinds of vegetation and water levels. If it is to survive, this species must have favorable breeding conditions without long periods of interruption. The sparrow exists in six subpopulations, all of which live in or around the Everglades. One of them is located apart from the others, which might provide the species with a measure of protection against extinction if some calamity were to wipe out the other five subpopulations. This important outlying group, called "Subpopulation A," lives directly south of the S-12 gates . . . and it decreased from more than 2,600 birds in 1992 to 112 birds in 2006. The Corps' method of releasing water into the Everglades, specifically at its S-12 gates, has been blamed for that decline.

Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1262 (11th Cir. 2009); see Record, no. 129-8, at 22 (noting that gate S-12A's water regulation schedule "probably has the greatest direct influence" on Subpopulation A's breeding).

15

The sparrow's habitat has been threatened by the Corps's water management activities for some time. Throughout the 1970s, Congress authorized minimum water delivery schedules for various Everglades basins and reservoirs. These minimum allocations, however, were frequently exceeded due to supplemental water discharges ordered by the Corps, which were done to ensure that water levels in the Everglades Agricultural Area were sufficient to meet water supply and flood control demands. Record, no. 128-5, at 15. These additional discharges had a dramatic effect on the surrounding environment. In particular, water levels became disproportionately high in the western half of Everglades National Park than in the eastern half. Unsurprisingly, this phenomenon caused the western portion of the park—where Subpopulation A is located—to become unnaturally wet. Record, no. 129-8, at 2. The park suffered severe ecological consequences as a result, including a decline in the Cape Sable seaside sparrow population. Record, no. 128-5, at 15.

Recognizing this dilemma, Congress in 1983 authorized the Experimental Program of Water Deliveries to the Everglades National Park.[15] This experimental

---

[15] "The Secretary of the Army is authorized, for a period of two years beginning with enactment of this Act with the concurrence of the Director of the National Park Service and the South Florida Water Management District, to modify the schedule for delivery of water from the central and southern Florida project to the Everglades National Park . . . and to conduct an experimental program for the delivery of water to the Everglades National Park from such project for the purpose of determining an improved schedule for such delivery." Supplemental Appropriations Act of 1984, Pub. L. No. 98-181, § 1302, 97 Stat. 1153, 1292-93 (1983).

16

program charged the Corps, the SFWMD, and the National Park Service to experiment with different methods of delivering water to the park in an effort to restructure the Corps's water management system and restore wildlife.[16]

Under the experimental program, the agencies instituted a series of tests, each lasting several years, designed to recalibrate the gate and canal systems to approximate the naturally occurring water flows that existed prior to manmade development in the Everglades. Each test involved releasing varying amounts of water from various gates. In 1995, the Corps introduced "Test 7," an experiment involving the release of large amounts of water through the S-12 gates, including the S-12A gate, which is located immediately north of the Subpopulation A habitat. Record, no. 129-1, at 10, 16–17.

Over the course of these experiments, the FWS consulted with the Corps regarding the requirements of the ESA, with particular focus on each experiment's impact on the Cape Sable seaside sparrow. The FWS surveyed the ecological impact of Test 7 and issued two biological opinions, one in October 1995 and a final opinion in February 1999. Both opinions concluded that continued operation

---

[16] In 1989, Congress passed the Everglades National Park Protection and Expansion Act, which extended the time period permitted for the experimental program—the experiments were to be completed "as promptly as practicable." Pub. L. 101-229, § 104(a)(2), 103 Stat. 1946, 1949 (1989). The Act also authorized the Modified Water Deliveries Project, which called for the construction of new modifications to the C&SF Project north of Everglades National Park. Id. § 104(a)(1). These modifications would be based on the results of the experimental program and would be designed "to improve water deliveries into the park and . . . to restore the natural hydrological conditions within the park." Id. § 104(a)(1–2).

17

of Test 7 would jeopardize the existence of the sparrow and adversely modify its habitat.  Record, no. 129-8, at 3.

In December 1999, in response to the FWS opinions, the Corps instituted the Interim Structural and Operational Plan ("ISOP").  The ISOP adopted several FWS recommendations intended to forestall additional harm to the sparrow until the Modified Water Deliveries Project[17] was complete.  Under the ISOP, the Corps made temporary structural modifications to the C&SF Project's water delivery system in an attempt to reduce high water levels in the sparrow's habitat.  The Corps also made water schedule changes, including closing the S-12 gates during the sparrow breeding season.  These modifications enabled greater control of water levels in the Subpopulation A habitat, which created more favorable nesting conditions for the sparrow.  Record, no. 129-4, at 3.

In 2002, the Corps replaced the ISOP with the Interim Operational Plan for the Protection of the Cape Sable Seaside Sparrow ("IOP"), a longer term solution to replenish the Sparrow population.[18]  The IOP is designed specifically to accommodate sparrow breeding patterns.  To increase the population, the sparrow must have at least two nesting cycles per year.  A nesting cycle only will occur if the sparrow's habitat remains continuously "dry" (water levels in the nesting

---

[17] See supra note 16.

[18] The IOP is also a temporary plan that will be followed until completion and implementation of the Modified Water Deliveries Project.  See supra note 16.

18

habitat must be below six feet) for approximately forty days.  Record, no. 129-8, at 22.  To maximize the number of continuously dry periods (in the hopes of achieving at least two, but as many as four, nesting cycles), the IOP requires that the S-12A gate be closed on November 1 and opened on July 15.  Record, no. 129-7, at 10.  This November to July period approximates the Everglades dry season.  The Everglades rainy season lasts from July to October.  Id. at 20.  The heavy rainfall in this period substantially increases the water level in the Sparrow's habitat, which prevents nesting cycles from occurring.  Because there is no risk of disrupting a nesting cycle during the rainy season, the S-12A gate is opened during this period to relieve the reservoirs of water buildup.  When this case was filed in the District Court, the Corps was operating under the IOP.

C.

In addition to being the subject of large-scale Corps operations, the Everglades is home to the Miccosukee Tribe of Indians of Florida.  The Tribe holds rights to use and enjoy certain portions of the Everglades.  This appeal involves an alleged clash between the Tribe's rights to use and enjoy these lands and the Corps's operational duties.

The Tribe is a federally-recognized Indian tribe, as defined under the Indian Reorganization Act of 1934.[19]  It maintains various land rights in the Everglades.

---

[19]  See Indian Reorganization Act, Pub. L. No. 73-383, 48 Stat. 984 (1934).

19

The lands that concern this appeal are (1) land held in trust by the federal government on behalf of the Tribe ("Reservation Land") and (2) land provided to the Tribe under a perpetual lease from the State of Florida ("Leased Land"). All of the Leased Land and a portion of the Reservation Land are located within WCA 3A.

1.

Indian peoples occupied Florida long before it became a United States territory. By the time the United States purchased Florida from Spain in 1821,[20] the Seminole tribe[21] was the dominant aboriginal culture in Florida. United States v. Seminole Indians of the State of Florida, 180 Ct. Cl. 375, 379, 383 (1967). When the United States took control of the Florida territories, the government moved quickly to reach a formal understanding with the Seminoles and resolve any potential land claims held by the tribe. In 1823, the Seminoles and the United States signed the Treaty of Camp Moultrie, which established a reservation in

---

[20] See Treaty of Amity, Settlement and Limits between the United States of America, and His Catholic Majesty, 8 Stat. 252, 254, 260 (1819).

[21] The Miccosukee tribe was originally part of the Seminole tribe. The Miccosukee split from the Seminoles due to disagreements over dealings with the United States government. The New History of Florida 204 (Michael Gannon ed., 1996).

20

central Florida for the Seminoles.  In exchange, the Seminoles agreed to relinquish all claim and title they had over the territory of Florida.[22]

After a shift in United States policy and the passage of the Indian Removal Act,[23] in 1832 the Seminoles and the United States signed the Treaty of Payne's Landing.  Under the treaty, the Seminoles agreed to relinquish to the United States all claims to the lands they were currently occupying (including the reservation established under the Treaty of Camp Moultrie) and move west of the Mississippi River.  In exchange, the United States provided monetary compensation and various services and provisions.[24]

The Treaty of Payne's Landing, however, was not fully successful in bringing about peace between the two nations.  In 1835, a small group of Seminoles who were opposed to the treaty's relocation plan began to attack federal troops.  Hostilities ensued from 1835 to 1842 in what is known as the Second Seminole War.  See Seminole Indians of the State of Fla. v. United States, 25 Ind. Cl. Comm. 25, 26–27 (1971).  To bring about a resolution to the conflict, in 1839 the Secretary of War issued orders to General Alexander Macomb to reach a temporary truce with the warring Seminoles.  General Macomb reached an

---

[22]  Treaty with the Florida Tribes of Indians, Sept. 18, 1823, 7 Stat. 224.

[23]  Indian Removal Act, 4 Stat. 411 (1830) (granting authority to the President to relocate Indians residing in any state or territory to territory west of the Mississippi River).

[24]  Treaty with The Seminoles, May 9, 1832, 7 Stat. 368.

armistice ("Macomb Truce"), in which the Seminoles agreed to retire to southern

Florida ("Macomb Area") until a formal treaty could be reached.[25]  President Polk

issued an Executive Order declaring the Macomb Area an Indian territory under

the Trade and Intercourse Act.[26]  Id. at 30.  As time went on, relations in the

Florida territory normalized and peace returned.  But the status of the lands

designated in the Macomb Truce remained unresolved.  The New History of

Florida 201–203 (Michael Gannon ed., 1996).  The Seminoles continued to reside

in the area under the color of the Macomb Truce, but without any definitive title or

right.

2.

Meanwhile, Florida became a state in 1845.  By this time, the United States

held title to the territory comprising the Everglades, which had been secured

through the purchase of the Florida territory from Spain in 1821 and the treaties of

Payne's Landing and Camp Moultrie.  In 1850, Congress transferred twenty-

---

[25]  The temporary zone contemplated by the armistice approximated five million acres, Seminole Indians of the State of Fla. v. United States, 25 Ind. Cl. Comm. 25, 32 (1971); General Macomb's orders allotted the Seminoles "that portion of the [Florida] Peninsula South of 27° 30$^m$ latitude, until they can be finally removed according to the terms of the treaty of Paynes Landing," id. at 28 (internal quotation marks and citation omitted).

[26]  Adjudication before the Indian Claims Commission has indicated that the designation of the Macomb Area as Indian territory by President Polk's Executive Order did not convey title of the land to the Seminoles; the designation merely rendered invalid any attempt to convey that land by the Seminoles to others, absent congressional approval.  Seminole Indians, 25 Ind. Cl. Comm. at 30.
The Trade and Intercourse Act provides that no purchase, grant, lease, or other conveyance of lands from any Indian nation or tribe of Indians shall be valid unless made by treaty or convention entered into pursuant to the Constitution.  25 U.S.C. § 177.

22

million acres of land, including the Everglades, to the State of Florida to oversee development of the area.[27]

In 1891, the State of Florida began planning to establish a permanent reservation for the Seminoles. Id. at 203. The Florida legislature established a reservation in 1917, designating 99,200 acres of Monroe County to be held in trust for the perpetual use and benefit of the Seminole Indians of Florida. Fla. Stat. §§ 285.01.

The placement of the Seminole reservation was short-lived. Growing federal interest in the Everglades led Congress to create the Everglades National Park in 1934.[28] The Seminole reservation was situated within the designated park area. As a result, the Florida legislature resolved to move the Seminole reservation; it withdrew the 99,200 acres in Monroe County, Fla. Stat. § 285.06, and granted 104,800 acres in Broward County as the new site for the Seminole reservation, Fla. Stat. § 285.03.[29] The Broward County reservation included land

_____

[27] Swamp and Overflowed Lands Act, 9 Stat. 519 (1850).

[28] Pub. L. No. 73-267, 48 Stat. 816.

[29] In response to the withdrawal of the Monroe County reservation, the Seminole tribe brought two claims against the United States before the Indian Claims Commission, alleging (1) that the Executive Order relating to the Macomb Truce conveyed title to five-million acres of land in southern Florida to the Seminole tribe and (2) that the federal government violated its duties to the tribe under the Trade and Intercourse Act, 25 U.S.C. § 177. The Commission found that the Executive Order did not convey title to the Seminoles and that there was no violation of the Trade and Intercourse Act for the Monroe County land exchange. The Commission did conclude, however, that the federal government could be found liable under the Indian Claims Commission Act on two possible theories: (1) participating in an unconscionable exchange or (2)

23

that is located within northwest WCA 3A.  In 1944, the State of Florida deeded the original Seminole reservation location—the 99,200 acres in Monroe County—to the United States, which was incorporated into Everglades National Park. Seminole Indians, 25 Ind. Cl. Comm. at 34–35 (1971).

After the substitution of reservation lands, in 1957 the Seminoles became a federally-recognized tribe.  Shortly thereafter, the federal government formally distinguished between the Seminole and Miccosukee tribes—a distinction that had existed in reality for some time—and granted the Miccosukee tribe federally-recognized status in 1962.  In 1971 the Florida legislature split the Broward County reservation, granting 76,000 acres for the use and benefit of the Miccosukee tribe and 28,000 acres to the Seminole tribe.  Fla. Stat. §§ 285.17; 285.18.  These 76,000 acres constitute the Reservation Land.

3.

In 1960, the Tribe received an additional interest in the Everglades—what later would become the Leased Land—from the State of Florida.  In 1959, a series of meetings were held with the governor of Florida and representatives of the Seminole tribe to commit certain state lands for Indian use.  The State of Florida set aside 143,620 acres of contiguous land for the Seminole tribe, along what is

---

failing to engage in fair and honorable dealings.  Seminole Indians, 25 Ind. Cl. Comm. at 37-38; see Indian Claims Commission Act, Pub. L. No. 79-726, § 2, 60 Stat. 1049, 1050 (1946).

currently the eastern border of the Reservation Land.  This grant, however, only gave the Seminoles a license to use and enjoy the land—a license that appeared to be revocable at the state's discretion.  See Indians and License to Use Certain Lands (AG Op.), Fla. Att'y Gen. Op. 75-68, 11 (1975) ("The license is revocable in the best interest of the State, does not convey title, but only a right to use and occupy." (internal quotation marks omitted))  In addition, the license was subject to all easements and other rights held by the SFWMD.  Id. at 7.

The legal foundations of the license were uncertain.  In addition to the impermanence of the license, a 1975 opinion by the Florida Attorney General called into question whether the license was properly granted pursuant to the language of the license agreement itself.[30]  Given that the State of Florida, the Seminoles, and the Miccosukee tribe had been acting as if the license had been valid for fifteen years, the Attorney General recommended that negotiations begin between the State of Florida and the tribes[31] to reach a more permanent agreement. Id. at 17.  A series of public hearings was held from 1976 to 1978 to fashion an agreement in which the State of Florida would hold the licensed lands in trust for the tribes.  Negotiations broke down, however, when the Governor conditioned the

---

[30] The language of the agreement calls for the joint approval of four state boards—approvals that apparently were never received.  See Indians and License to Use Certain Lands (AG Op.), Fla. Att'y Gen. Op. 75-68, 7 (1975).

[31] By this time, the Miccosukee had been recognized as a distinct tribe.

25

agreement on the Miccosukee tribe waiving any outstanding legal claims they may have had against the State of Florida.  See 128 Cong. Rec. S11286 (daily ed. Sept. 10, 1982) (statement of Sen. Lawton Chiles).

After withdrawing from negotiations and examining their potential legal claims, the Tribe filed suit in federal court.  Miccosukee Tribe of Indians of Fla. v. Florida, No. 79-253 (S.D. Fla. 1979).  The Tribe alleged two claims: (1) the State of Florida wrongfully flooded the Reservation Land based on illegally granted easements to various state agencies—including the SFWMD—in violation of the Trade and Intercourse Act, 25 U.S.C. § 177,[32] and (2) the State of Florida illegally appropriated lands committed to the Tribe by Executive Order under the Macomb Truce.

Settlement negotiations began immediately.  Although the Indian Claims Commission had previously rejected the claim relating to the Macomb Truce Executive Order in 1971,[33] the suit nevertheless threatened to cloud the title over a great deal of Floridian lands, both publicly and privately owned.  See 25 U.S.C. § 1714 (referencing the 1979 suit and finding the pendency of the suit could result in economic hardship for Florida residents).  On April 16, 1982, the Tribe and the

---

[32] See supra note 26.  An Indian tribe has a cause of action under federal common law to establish its right to land allegedly conveyed in violation of the Act.  See, e.g., Narragansett Tribe of Indians v. S. R.I. Land Dev. Corp., 418 F. Supp. 798 (D.R.I. 1976).

[33] See supra note 29.

26

State of Florida entered into a settlement agreement ("Settlement Agreement") to resolve the dispute.

The Settlement Agreement enumerated a series of obligations for both parties. Under the agreement, the Tribe agreed to extinguish all right, title, interest, or claim it may have possessed in any public or private lands or natural resources in Florida.[34] Record, no. 1, at 58-63. In exchange, the State of Florida agreed to enter into a lease agreement ("Lease Agreement") that would grant the Tribe a perpetual leasehold interest in the lands described in the agreement.[35] Id. at 63.

The Settlement Agreement also incorporated all the commitments and obligations enumerated in the Lease Agreement. The Lease Agreement stated that it had three purposes: "(1) to preserve the Leased Land in its natural state for the use and enjoyment of the Miccosukee Tribe and the general public; (2) to preserve fresh water aquatic life, wildlife, and their habitat; and (3) to assure proper management of water resources." Record, no. 1, at 35. It also granted the Tribe a

---

[34] In addition to the Leased Land and the Reservation Land, the Tribe retained rights to certain land interests not relevant here.

[35] The State of Florida also agreed to (1) construct a road connecting the Tribe's lands; (2) pay the Tribe a sum of $975,000; and (3) waive any and all claims for offsets, including tort and contract claims, which were or could have been asserted by the State of Florida or its agencies. Record, no. 1, at 63, ¶ 4.

variety of specific rights over the Leased Land, the most important of which was

the right to use and enjoy the Leased Land.[36]

In exchange, the Tribe agreed to various concessions.[37]  A critical

concession was that the rights granted to the Tribe were not absolute.  All rights

granted under the Lease Agreement were subject to the water management

activities of the SFWMD and the Corps as follows:

> [t]he Leased Area has for many years comprised a portion of a large
> reservoir utilized for the flowage and storage of water servicing the
> area of Broward, Dade, Monroe and Collier Counties and designated
> as Water Conservation Area 3 as part of the federally authorized
> project of flood control and water management for central and
> southern Florida.  The [Florida Game and Freshwater Fish]
> Commission and the . . . Tribe agree that all of the rights [granted to
> the Tribe in the Lease Agreement] are subject to and shall not
> interfere with the rights, duties and obligations of the SFWMD or the
> [Corps], pursuant to the requirements of the aforesaid federally

---

[36]  Under the Lease Agreement, the Tribe was also granted (1) the right to hunt and fish for subsistence purposes; (2) the right to take frogs for consumption as food and for commercial purposes; (3) the right to engage in traditional subsistence agricultural activities on the Leased Land; (4) the right to reside in the Leased Land, including the construction of traditional homes; (5) the right to use the Leased Land for tribal religious purposes; (6) the right to take and use native materials from the Leased Land for tribal purposes, fabrication into artifacts, utensils, handicrafts and souvenirs for sale; (7) the right to receive 50% of the net revenue derived from the exercise of mineral rights in the Leased Land, and the right to require that any exercise of these rights be performed in accordance with reasonable and acceptable methods which best protect the natural state and beauty of the Leased Land with least disruption to tribal uses listed under the Lease Agreement; (8) a guarantee from the State of Florida not to construct additional revenue-producing facilities within a half mile of the Leased Land without the Tribe's consent; and (9) a guarantee to be compensated by the State for any public hunting and fishing that occurs on the Leased Land.  Record, no. 1, at 29, 33-36, ¶¶ 1, 3–4.

[37]  These concessions included: (1) the Florida Game and Freshwater Fish Commission could continue freshwater aquatic life and wildlife management programs; (2) the public could enter the Leased Land to engage in non-commercial recreational activities provided they did not interfere with the rights of the Tribe; and (3) the public could engage in commercial recreational activities with consent of the Tribe.  Id. at 33-36, ¶¶ 3–4.

authorized project, conveyances, easements, grants, rules, statutes, or any other present or future lawful authority to manage, regulate, raise, or lower the water levels within the Leased Area or Water Conservation Area 3.

Record, no. 1, at 37, ¶ 6.

For all the rights granted and obligations incurred under the Settlement and Lease Agreements, the primary concession made by the Tribe was its agreement to relinquish all land claims in Florida. Because the Lease and Settlement Agreements would extinguish tribal land claims, they required approval by Congress before they could become effective.[38] Congress approved the Lease and Settlement Agreements in the Florida Indian Land Claims Settlement Act of 1982 ("FILCSA"), 25 U.S.C. §§ 1741–1749.

With regards to Leased Land, the FILCSA did three things. First, the legislation approved the Lease and Settlement Agreements between the Tribe and the State of Florida in satisfaction of the Trade and Intercourse Act. Id. §§ 1743–1744. Second, the legislation extinguished any aboriginal right, title, interest, or

---

[38] Congressional approval is required to extinguish title in land held by Indians under the Trade and Intercourse Act. 25 U.S.C. § 177. Congress passed the first version of the Trade and Intercourse Act, 1 Stat. 137, in 1790. "The obvious purpose of [the Act] is to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress, and to enable the Government, acting as parens patriae for the Indians, to vacate any disposition of their lands made without its consent." Fed. Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 119, 80 S. Ct. 543, 555, 4 L. Ed. 2d 584 (1960). Congress therefore was required to pass the Florida Indian Land Claims Settlement Act of 1982 in order to give the Settlement and Lease Agreements legal effect.

claims to land within the State of Florida held by the Tribe.[39]  Id. § 1744.  Third,

the FILCSA indicated that the Act did not "grant to the Miccosukee Tribe any

greater rights or interests in the leased area other than those expressly set forth in

the Lease Agreement." Id. § 1746.

The FILCSA also altered the character of the Reservation Land.  It

authorized the Secretary of the Interior to accept the transfer of the Reservation

Land from the State of Florida to the United States to hold in trust for the Tribe.[40]

Of particular importance, the FILCSA noted that the transfer of the Reservation

Land to the United States rendered that land subject to all rights, easements, and

reservations in favor of the SFWMD, ensuring that the SFWMD, in conjunction

with the Corps, possessed the legal authority to conduct water management

activities within the Reservation Land.[41]  Once the FILCSA was passed, the State

---

[39]  The Tribe's aboriginal title regarding certain areas of land designated the "excepted interests" was not affected by the FILCSA.  25 U.S.C. § 1744(b).  These lands are not relevant to the case before us.

[40]  "The Secretary [of the Interior] is authorized and directed to accept the transfer to the United States, to be held in trust for the use and benefit of the Miccosukee Tribe of Indians of Florida, of the lands authorized to be conveyed to the Miccosukee Tribe by [Fla. Stat. § 285.061], and the lands described in Dedication Deed No. 23228 from the Trustees of the Internal Improvement Trust Fund subject to the provisions of [Fla. Stat. § 285.061], and of this section." 25 U.S.C. § 1747(a).

[41]  The FILCSA states in pertinent part:

(c) Transfer of lands as subject to existing leases, etc.; additional water rights
     (1) Any transfer of lands under this section shall be subject to all existing
     leases, easements, and rights-of-way, and all the rights, easements, and
     reservations in favor of the Central and Southern Florida Flood Control

30

of Florida deeded to the United States the 76,000 acres comprising the Reservation Land ("Trustee Deed").  Record, no. 1, at 95.  The Trustee Deed set forth that the United States would hold the Reservation Land in trust for the use and benefit of the Tribe.  It also contained the same rights, easements, and reservations language in favor of the SFWMD's water management activities as was enumerated in the FILCSA.  Id. at 96.

Based on the language concerning water management activities on the Leased Land and the Reservation Land in the FILCSA, the Lease Agreement, and the Trustee Deed, the Corps and the SFWMD continue to operate the C&SF Project within WCA 3.

\*     \*     \*

In summary, since 1948, the federal government has been operating water control structures under the C&SF Project.  The project was originally intended to benefit two constituencies: the agricultural areas immediately south of Lake Okeechobee and the residential areas along South Florida's eastern coast.  The project ensures that these areas have adequate drought and flood protection.  If

---

District [now the SFWMD] and shall not increase, diminish, modify, or otherwise affect the extent to which chapter 373, Florida Statutes, and its successor laws, have force and effect within such lands.
(2) Any transfer of lands under this section shall not confer upon the Miccosukee Tribe, or upon the lands within the reservation, any additional water rights.

25 U.S.C. § 1747(c).

31

water levels in these areas are too high, the Corps opens the canal gates and transfers water from the agricultural and residential areas into the WCA reservoirs.

In 1973—with the passage of the Endangered Species Act—the project became beholden to a third constituency: the Cape Sable seaside sparrow. Since the ESA's passage, the Corps has been required to balance the flood protection and water supply interests of residential and agricultural areas with the ecological interests of the sparrow when designing its water regulation schedules.

In 1982, the Tribe obtained the right to use and enjoy the Leased Land and the Reservation Land under the Lease Agreement and the Trustee Deed. These agreements took legal effect when Congress approved them in the FILCSA. A significant portion of these lands is located in WCA 3A, a reservoir that stores water from the residential and agricultural areas. Water levels in the WCA 3A are controlled, in part, by the S-12A gate, which releases the reservoir's water into Everglades National Park. By the time the Tribe obtained rights to the Leased Land and the Reservation Land, the Corps had been conducting water management operations in WCA 3A for thirty-four years. Paragraph 6 of the Lease Agreement and § 8 of the FILCSA acknowledged these activities and subjected any rights granted to the Tribe in the Leased Land and the Reservation Land to them.

Since 2002, the Corps has been operating the S-12A gate under the IOP, which is a water regulation schedule specifically designed to promote sparrow

32

breeding. The IOP requires that the S-12A gate be closed during the Everglades dry season, November 1 to July 15, and opened during the Everglades rainy season, July 15 to October 31. This schedule is intended to maximize the number of continuously dry periods in the sparrow habitat, which encourages sparrow breeding.

The IOP does not affect the water level priorities of the agricultural and residential areas to the north and east of the WCA reservoirs. The Corps will fill the WCA reservoirs to ensure that these areas have proper drought and flood protection. The Tribe's enjoyment of its land therefore is always at the mercy of the water needs of these two constituencies. Between November 1 and July 15, the Tribe is also at the mercy of the sparrow: if the residential and agricultural areas bring in too much water (such that water levels rise high enough to interfere with the Tribe's use and enjoyment of its land), the Corps will not deplete the WCA 3A of water because the IOP calls for the S-12A gate to be closed. Thus, the risk that the Tribe will experience high water levels is at its peak at the beginning of November—the end of the rainy season. For though the S-12A gate remains open between July 15 and November 1, the water level in the reservoir still increases month by month throughout the rainy season. Accordingly, when the S-12A gate finally closes on November 1, the reservoir will be at its highest level. See Record, no. 129-7, at 20 (indicating WCA 3A's monthly average water elevation and

33

demonstrating that water levels are highest in October). Though this risk is present every year by October 31, there is no guarantee that the Corps will modify its schedule to prevent the S-12A gate from closing on November 1.[42]

The model we have sketched above favors both the residential and agricultural areas and the sparrow over the Tribe. If there is too much water in the north, water is released into the WCA reservoirs. If there is too much water in the WCA, the Corps will not open the gates in the south to drain the reservoir between November 1 and July 15. The net result is that the Corps's activities create the conditions for high water levels in the WCA, even though high water levels may interfere with the Tribe's use and enjoyment of its land.

Given this relationship, it was just a matter of time before the interests of the Corps and the Tribe clashed.

E.

In June 2008, a forest fire known as the West Camp Fire burned over 2,000 acres of the Cape Sable seaside sparrow's Subpopulation A habitat. On July 11, 2008, representatives from the Corps, the FWS, and the Everglades National Park Service discussed possible modifications to the water regulation schedule in

---

[42] There is a provision in the IOP that allows the Tribe to request a departure from the water regulation schedule (such as a later closing date for the S-12A gate) whenever its Chairman determines that water conditions jeopardize the health or safety of the Tribe. See supra note 10. But this option neither requires the Corps to make any particular findings nor does it compel the Corps to alter its schedule—all adjustments are made at the discretion of the Corps.

response to the fire. The National Park Service reported that the fire had burned away a substantial amount of vegetation in the Subpopulation A habitat and that water flow through the habitat would disrupt the sparrow's nesting cycle if it did not contain sufficient vegetation. The group was concerned that opening the S-12A gate on July 15, as scheduled in the IOP, would not permit enough time for the vegetation to return. The group concluded that a ten-day delay should be implemented to ensure sufficient vegetation regrowth and allow sparrow hatchlings enough time to complete the nesting cycle. The Corps agreed to keep the S-12A gate closed until July 25. Record, no. 130-2, at 2. The gate remained closed until July 24—nine days after the scheduled opening under the IOP.

In October 2008, the Corps began releasing excess water from Lake Okeechobee according to its water schedules. Shortly thereafter, the Tribe's Chairman observed flooding on tribal lands and extremely high water levels in WCA 3A. The Chairman requested by letter that the Corps allow the S-12A gate to remain open beyond the scheduled November 1 closure date listed in the IOP. The Tribe's letter stated that conditions in WCA 3A were "extremely dire" and that failure to release additional water through the S-12A gate would endanger the "health, safety, and welfare of the Tribe." Record, no. 130-4, at 1. On October 31, 2008—one day before the scheduled closure of S-12A—the Corps denied the Tribe's request in writing, explaining that it was not aware of any facts that

35

constituted a threat to the health or safety of Tribe members that had not been accounted for in the IOP.  Record, no. 130-5, at 2.  The Corps's letter listed additional steps that were being taken to reduce the water levels in WCA 3A and explained that the FWS had "informed the [Corps] that [the FWS could not] endorse continued operation of S-12A beyond November 1."  Id. at 1.

## II.

## A.

Anticipating that the Corps would deny its request to leave the S-12A gate open beyond November 1, the Tribe, on October 28, 2008, filed this suit for declaratory and injunctive relief in the United States District Court for the Southern District of Florida, alleging that the manner in which the Corps had been operating the C&SF Project caused extreme flooding of tribal lands and would continue to do so in the future.[43]

The Tribe's complaint contains four counts, each incorporating by reference the Lease Agreement, the Settlement Agreement, the Trustee Deed, and the FILCSA, which are attached as exhibits.

Count I, titled "Violation of Plaintiff's Rights under the Florida Indian Land Claims Settlement Act," alleges that:

---

[43]  Unless stated otherwise, any reference to the "Corps" in the remainder of this opinion refers to all appellees.

75.    Congress, through the Florida Indian Land Claims Settlement Act of 1982, waived Tribal land claims in exchange for specific property rights for the Miccosukee Tribe, as set forth in the Perpetual Lease and the Trustee Deed.

76.    Defendants are required to protect, and must not interfere, [sic] with the Rights granted to the Tribe in the Settlement Agreement, the Perpetual Lease and the Trustee Deed.

77.    Defendants have failed to protect, and have interfered, [sic] with the Tribe's rights under the Settlement Agreement, the Perpetual Lease, and the Trustee Deed.

[65.    Defendants' actions have caused and are causing extreme flooding of the lands where the Miccosukee people live, including WCA 3A, thereby taking and destroying Plaintiff's property, impairing Plaintiff's rights under the Perpetual Lease, and otherwise impairing Plaintiff's rights.][44]

78.    Plaintiff is irreparably harmed as a result of Defendants' actions, and has no remedy at law.  A balancing of the equities and the public interest militate in favor of granting Plaintiff preliminary and permanent injunctive relief against further interference and violations by Defendants of Plaintiff's legal rights.

79.    Plaintiff has rights under the Florida Indian Land Claims Settlement Act, the Permanent Lease and the Trustee Deed and Defendants' actions are violating such rights.

Record, no. 1, at 17-19, ¶¶ 65, 75-79.

Count II, titled "Violation of Plaintiff's Due Process Rights,"

alleges that:

---

[44]  Paragraph 65 is a general allegation of the complaint that is incorporated by reference into Count I.  See Record, no. 1, at 18, ¶ 74 ("Plaintiff realleges and reavers the allegations in paragraphs 1 through 73 as though fully set forth herein.").

82.     As more fully set forth above, Defendants have violated Plaintiff's rights and protections under the Fifth Amendment of the Constitution of the United States by acting in a manner that deprived Plaintiff of life, liberty and property without due process of law through actions that have stopped the flow of water through the Everglades and backed up excessive amounts of water on Tribal lands, resulting in the flooding and destruction of the traditional homeland of the Miccosukee people that the government promised to preserve in a natural state in perpetuity for the use and enjoyment of the Tribe.

83.     Plaintiff has rights under the Constitution of the United States, the Florida Indian Land Claims Settlement Act, the Perpetual Lease and the Trustee Deed, which Defendants are violating.

Id. at 19-20, ¶¶ 82-83.

Count III, titled "Action in the Nature of Mandamus against Defendants,"

alleges that:

87.     Plaintiff has a clear right to be protected from actions by Defendant that cause excessive and damaging water levels on Tribal Lands and property in violation of the Tribe's rights under the Florida Indian Land Claims Settlement Act, the Permanent Lease and the Trustee Deed.

88.     Defendants have a clear legal duty to operate the C&SF Project in accordance with its design specifications, but have failed to fulfill such duty as more fully set forth above.

89.     Defendants have a clear legal duty not to flood and destroy Plaintiff's property in violation of the U.S. Constitution, Florida Indian Land Claims Settlement Act, the Perpetual Lease and the Trustee Deed.

90.     Defendants have taken affirmative actions that have stopped the flow of water through the Everglades and caused excessive flooding of Plaintiff's property in violation of the U.S. Constitution, Florida

38

Indian Land Claims Settlement Act, the Perpetual Lease and the Trustee Deed.

Id. at 21, ¶¶ 87-90.

Count IV, titled "Violation of Equal Protection Rights," alleges that:

[60.    When discharging excess water from the storms, Defendants acted to restrict the amount of flood waters pumped into other areas, including federal government lands in the Loxahatachee National Wild Life Refuge (WCA 1), to protect it from damage.

61.    Defendants took actions to protect non-Indian people and non-Indian land from excess flood water while the lands of the Miccosukee Tribe of Indians and the Miccosukee people, including, but not limited to the Leased Lands in WCA 3A, were not provided any relief.][45]

94.    From on or about December 1998 to the present, and on-going, the federal Defendants have violated the rights and protections of the Miccosukee Tribe and the Miccosukee people under the Fourteenth Amendment of the Constitution of the United States by acting, and failing to act, in a manner that deprived the Miccosukee Tribe and the Miccosukee people and the Tribal Everglades in WCA 3A, of equal protection guarantees through their disparate, unequal, and discriminatory water management.

95.    In doing so, Defendants were actively and directly involved in violations of Constitutional guarantees of equal protection of the Miccosukee Tribe and the Miccosukee people.

96.    In addition, the Miccosukee people, consisting of all racially-defined Miccosukee Indians (including both those Miccosukee Indians who have joined the Tribe and those Miccosukee Indians who have not joined the Tribe) are a discrete and insular minority which is

---

[45]  Paragraphs 60 and 61 are general allegations of the complaint that are incorporated by reference into Count IV.  See Record, no. 1, at 22, ¶ 92 ("Plaintiff realleges and reavers the allegations in paragraphs 1 through 72 as though fully set forth herein.").

39

less able to use the majoritarian protections of the political system to protect their rights.

97.    Thus, the governmental actions or classifications which discriminatorily and adversely disfavor the Miccosukee people (in favor of non-Miccosukee interests) are subject to heightened scrutiny under the equal protection clause.  The governmental action alleged herein fails the test of heightened scrutiny; the governmental action does not achieve any compelling state interest (in fact, it fails to achieve any positive results); the governmental action is not essential and necessary because it disregards viable alternatives which would be less harmful to the Miccosukee people.

98.    Plaintiff Tribe seeks a declaration that Defendants are operating the Central and Southern Florida Project in a discriminatory manner that does not provide the Miccosukee people and the Miccosukee Tribe of Indians, and the Tribal Everglades, with equal protection of the laws and an injunction against doing so.

Id. at 16, 22-23, ¶¶ 60-61, 94-98.

B.

The Corps responded to the complaint with a motion to dismiss for failure to state a claim for relief.  Fed. R. Civ. P. 12(b)(6).  The gist of its motion was that whatever rights the Tribe possesses are expressed in the Lease Agreement and the Trustee Deed and are subject to provisions in those agreements—which provide that easements held by the SFWMD and the Corps are superior to the Tribe's rights of use and enjoyment of the Leased Land and the Reservation Land. According to the Corps, those easements essentially rendered it immune from the Tribe's suit for injunctive relief from the flooding of tribal lands.  As a fallback position, the Corps argued that the Tribe had unsuccessfully asserted the same

40

claims in previous lawsuits, and therefore the claims were barred by the doctrine of collateral estoppel. The Tribe responded to the motion to dismiss by asserting, first, that the easements did not give the Corps an unfettered right to flood its property and, second, that collateral estoppel did not bar the claims.

## C.

The District Court granted the Corps's motion to dismiss as to Counts I, II, and III, but denied the motion as to Count IV. The court concluded that Count I failed to state a claim for relief because "the precedents of [the District Court for the Southern District of Florida] concerning the Miccosukee Tribe's ability to bring claims under the [FILCSA, i.e., the Lease Agreement and the Trustee Deed] challenging the water levels in the Leased Area or WCA 3A so clearly bar Plaintiff's claim that this Court finds that this claim is frivolous." Record, no. 37, at 4–5 (citing Miccosukee, 980 F. Supp. at 461-62). Moreover, the District Court held that dismissal was warranted because ¶ 6 of the Lease Agreement[46] and § 8 of the FILCSA[47] provide that the Tribe's rights to the lands within the WCA 3A "are subservient to, and cannot interfere with, the rights and duties of the Corps and the SFWMD to raise or lower the water levels in the Leased Lands and WCA 3A." Id. at 4.

---

[46] See Record, no. 1, at 37, ¶ 6.
[47] See 25 U.S.C. § 1747(c).

41

Precedent, in the court's view, required the dismissal of the Count II due process claim as well. Id. at 6 (citing Miccosukee, 980 F. Supp. at 463–64, and Miccosukee Tribe of Indians of Fla. v. United States, No. 02-22778 (S.D. Fla. July 30, 2007) (Report and Recommendation, at 8–9 (O'Sullivan, Magistrate, J.) (adopted by Moore, J.)). As the court correctly observed, those cases held that because "the Lease specifically reserved to the Corps and SFWMD the right to control water levels in the Leased Area and WCA 3A . . . the Miccosukee Tribe lacked a constitutionally protected property interest that would enable them to prevail on a due process claim based on water levels." Id.

The court dismissed Count III because "the Corps and SFWMD's management of water levels through the C&SF project is precisely the kind of discretionary action that is outside of this Court's mandamus jurisdiction." Id. at 9 (citing Kirkland Masonry, Inc. v. C.I.R., 614 F.2d 532, 534 (5th Cir. 1980)).

The court denied the Corps's motion to dismiss as to Count IV because "plaintiff . . . sufficiently pleaded an equal protection claim, " in that the complaint alleged "that Defendants' water management actions have been taken, at least in part, because of, and not merely in spite of, adverse effects on the Miccosukee Tribe." Id. at 7–8.

At the close of discovery on the Count IV claim, the Corps moved the court for summary judgment. The court granted the motion, but it did not rule on the

42

claim as stated in Count IV of the complaint and in its order denying the Corps's motion to dismiss.  As stated in the complaint, Count IV alleged that the Corps denied the Tribe and its members the equal protection of the law by taking steps to protect non-Indian People and non-Indian lands against excess flood water and diverting the water to tribal lands.  In granting the Corps summary judgment, the court, drawing on a statement in the Tribe's Response in Opposition to Defendants' Motion for Summary Judgment, interpreted the Tribe's equal protection claim as "limited to: (1) the Corps' decision to postpone opening the S-12A gate from July 15, 2008, to July 24, 2008; and (2) the Corps' refusal of the Tribe's request to leave the S-12A gate open after November 1, 2008."  Record, no. 175, at 6.  According to the court, whether these two decisions denied the Tribe and its members equal protection of the law depended on whether the Corps had a "rational basis" for the decisions.  The court found a rational basis and therefore denied the Tribe's Count IV claim.[48]

After granting the Corps's motion, the District Court entered a final judgment for the Corps on all claims.  The Tribe appeals, challenging the court's

---

[48]  The court found no violation, stating that (1) the "Corps left the S-12A gate open from July 15 to July 24, 2008, to protect the fledgling of the sparrows and to mitigate the effects of the fire" and (2) the "closure of the S-12A gate on November 1 was taken pursuant to the WCA 3A regulation schedule, which in conjunction with the IOP, the BiOp 2006, and other related documents, assists the Corps in achieving its water management obligations in compliance with federal statutory requirements, including the Endangered Species Act."  Record, no. 175, at 28.

order dismissing Counts I, II, and III and its order granting summary judgment on Count IV.

III.

We cannot undertake a review of the District Court's ruling without pausing to comment on the quality of the Tribe's complaint. Most of the complaint's allegations are general and are devoted to description of the Tribe's history, the importance of the Everglades to the livelihood of its members, the evolution and implementation of the C&SF Project, and the injury the members suffer when tribal lands are flooded. The remaining allegations of the complaint are a tangled morass of vague and conclusory statements; thus, the theory of liability that each count asserts is, but for the count's title, difficult to discern.

A plaintiff must "plead factual matter that, if taken as true, states a claim" that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 666, 129 S. Ct. 1937, 1942–43, 173 L. Ed. 2d 868 (2009). Each count incorporates by reference the complaint's general allegations, in paragraphs 1 through 73, then, in conclusory language, advances the count's cause of action. These allegations do not comport with Iqbal requirements. Not only is this apparent from a straightforward reading of the allegations, it is apparent from the Corps's responses. For example, in answering the allegations of Count IV, the Corps's answer states, in thirteen separate paragraphs, that the complaint's allegations are "vague, ambiguous, or

44

uncertain." Record, no. 42, at 5, 9, 10, 12, 14–15. We find that the District Court, itself, had difficulty discerning the predicates for the theories of liability asserted. In its order dismissing Counts I through III, the court does not expressly address the complaint's allegations; instead, it focuses on the District Court for the Southern District of Florida's precedent—in cases previously brought by the Tribe against the Corps and the SFWMD. Additionally, the court's order disposing of Count IV's equal protection claim does not refer to the parties that benefit when the Corps allegedly floods the Tribe's land in a discriminatory manner.

The Corps should have moved the District Court to order the Tribe to provide it with a "more definite statement" under Federal Rule of Civil Procedure 12(e), but it did not do so. Nor did the court require a more definite statement on its own initiative. See Cesnik v. Edgewood Baptist Church, 88 F.3d 902, 907 n.13 (11th Cir. 1996) (describing the district court's power to order a more definite statement sua sponte). In Magluta v. Samples, we found the complaint's allegations so nebulous as to preclude meaningful appellate review—especially with respect to the "serious constitutional issues" the complaint presented. 256 F.3d 1282, 1284 (11th Cir. 2001). We therefore vacated the district court's judgment and remanded the case for repleading. This case likewise presents serious constitutional issues. As in Byrne v. Nezhat, after hearing oral argument and wading through the voluminous record, "our first thought was to return the

45

case to the district court and instruct it to narrow the issues by ordering the plaintiff to redraft the complaint so that it conformed with the pleading requirements of Fed. R. Civ. P. 8 and 10." 261 F.3d 1075, 1134 n.115 (11th Cir. 2001). We choose not to do so, however, because we believe that we can discern enough from the complaint's allegations to dispose of this appeal with confidence. That said, we turn to the District Court's dispositive rulings.

The sine qua non of the District Court's dismissal of Counts I through III is that the Lease Agreement and the Trustee Deed authorize the Corps and the SFWMD to flood its lands with impunity, regardless of the extent to which the flooding interferes with the Tribe's use and enjoyment of the Leased Land and the Reservation Land. The Tribe argues that the rulings defy logic and common sense and thus must be reversed.[49] With this argument in mind, we examine the legal sufficiency of the allegations of Counts I, II, and III.

## A.

Count I alleges that the "Defendants are required to protect, and must not interfere, [sic] with the Rights granted to the Tribe . . . in the [Lease Agreement] and the Trustee Deed," and that the "Defendants have failed to protect, and have interfered, [sic] with the Tribe's rights under the . . . [Lease Agreement], and the Trustee Deed." Record, no. 1, at 17-19, ¶¶ 76-77. The Tribe contends that the

---

[49] The Tribe advances several arguments for the reversal of the court's rulings; all boil down to the argument as we have posed it.

46

FILCSA obligates the Corps to protect and not interfere with its rights under the Lease Agreement and the Trustee Deed.  All that the FILCSA does, however, is approve the Lease Agreement and create a reservation through the Trustee Deed; the FILCSA does not obligate the Corps to "protect" and "not interfere with" the Tribe's rights under the Lease Agreement.  And we find nothing in the language of the Lease Agreement or the Trustee Deed creating such obligation.

We have considered the possibility that the Tribe finds the Corps's obligation to protect its rights, not in the language of these instruments or the FILCSA, but, instead, under the Corps's authority to conduct lawful water management activities.  Those activities, which have to do with the administration of the C&SF Project, take place on easements held by the SFWMD.  The Tribe may be contending that the Corps's activities—here, flooding tribal lands—are beyond the scope of the SFWMD's easements.  In other words, the Corps is akin to a trespasser.

These easements, which limit the Tribe's right to use and enjoy the land, are not part of the record.[50]  Unless the terms of the easements are known, it cannot be

---

[50]  The Lease Agreement refers to the SFWMD's easements and the C&SF Project with this language:

> [The Tribe's] rights . . . are subject to and shall not interfere with the rights, duties and obligations of the SFWMD or the [Corps], pursuant to the requirements of the . . . conveyances, easements, grants, rules, statutes, or any other present or future lawful authority to manage, regulate, raise, or lower the water levels within the Leased Area or Water Conservation Area 3.

47

determined whether the flooding is beyond their scope. The complaint's allegations shed no light on what those terms might be. In sum, the complaint contains nothing—beyond a bald conclusion—to support Count I's allegation that the Corps has an obligation to "protect" and "not interfere with" the Tribe's rights. Because the complaint contains no allegation establishing such obligation, the District Court properly dismissed Count I for failure to state a claim for relief.

B.

Count II alleges that "Defendants have . . . deprived Plaintiff of life, liberty and property without due process of law through actions that have stopped the flow of water through the Everglades and backed up excessive amounts of water on Tribal lands, resulting in the flooding and destruction of the traditional homeland of the Miccosukee people that the government promised to preserve . . . for the use and enjoyment of the Tribe." Record, no. 1, at 19-20, ¶ 82. Because the Tribe alleges that the Corps's water management activities have deprived the Tribe of its rights to use and enjoy the Leased Land and the Reservation Land—and nowhere does the complaint allege a deprivation of a life or liberty interest—we read Count II as alleging the deprivation of property without due process of law.

---

Record, no. 1, at 37, ¶ 6. The Trustee Deed refers to the SFWMD's easements, but not the project, thusly: The tribal lands "shall be subject to all existing leases, easements and rights of way, and all rights, easements and reservations in favor of the [SFWMD]." Record, no. 1, at 96.

48

The District Court held that the interests the Tribe holds pursuant to the Lease Agreement and the Trustee Deed do not qualify as property within the intendment of the Due Process Clause. We disagree; the interests obviously qualify as a property entitled to procedural due process protection. The Corps cannot take all or part of the Tribe's property interests under the Lease Agreement and the Trustee Deed without affording the Tribe due process. The question is: what process was due? To state a claim for the denial of property without due process of law, the plaintiff must allege (1) deprivation of a constitutionally-protected property interest; (2) governmental action; (3) and constitutionally inadequate process. Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). Count II contains no allegation of the process the Tribe claims was due, much less that it was inadequate. The District Court's dismissal of Count II is accordingly affirmed. See Tinney v. Shores, 77 F.3d 378, 382 (11th Cir. 1996) (holding that, by failing to allege inadequate process, appellant did not state a procedural due process claim).

C.

Count III essentially mimics Count I, except that the remedy sought is a writ of mandamus.  Count III fails for the same reasons we find Count I insufficient to state a claim; hence, the District Court was required to dismiss it.

D.

As noted in part II.C, the District Court, in disposing of Count IV, disregarded its allegations and, in effect, treated Count IV as though it had been amended—to conform to a statement the court found in the Tribe's response to the Corps's motion for summary judgment.[51]  In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment.  Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam).  "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)."  Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006).  And it goes without saying that the court is barred from amending a plaintiff's claim.  One reason for barring such amendment is that in sua sponte amending a plaintiff's claim on summary judgment, the court may create the impression that it has become the plaintiff's

---

[51]  We find nothing in the record to indicate that the court, in effectively amending Count IV, was exercising its power under Rule 16(c)(2)(A) or (B) to narrow or recast the issues before it.

50

advocate—or his worst enemy—depending on what the court does with the claim after amending it.  We therefore decide the Tribe's appeal of the Count IV judgment by assessing the record in the light of Count IV's allegations, as stated in the complaint.

Count IV alleges that the Corps deprived the Tribe and its members of the equal protection of the law "under the Fourteenth Amendment of the Constitution of the United States . . . through their disparate, unequal, and discriminatory water management."  Record, no. 1, at 22, ¶ 94.  Although the Fourteenth Amendment does not apply to the Corps (because it is not a state or local governmental entity), we treat Count IV as having been brought under the equal protection component of the Fifth Amendment's Due Process Clause.  Bolling v. Sharpe, 347 U.S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954).

Count IV tells us that the Corps, in discharging its obligations under the C&SF Project, restricted the amount of water pumped into areas other than tribal land; that it took actions to protect non-Indians and non-Indian land from excess flood water; and that it failed to provide tribal lands with any relief.  Although Count IV does not say whether the Corps did all of this at the same points in time, we assume that it did.  That is, the flood waters would have covered the entire C&SF Project area had the Corps not diverted more of the excess water to the WCA 3A reservoir than to other areas.

51

Count IV's allegations are so vague and ambiguous that in order to determine whether they state a cause of action, we would have to make all sorts of assumptions. Among other things, we would have to assume the nature and location of the other areas; that they were similarly situated to tribal lands that were inundated; and that the water was diverted contrary to C&SF Project specifications. We decline to indulge these assumptions. Moreover, the Tribe's response to the Corps's motion for summary judgment contains nothing to fill in the blanks created by Count IV's allegations. In short, Count IV fails to allege a case sufficient to withstand a motion to dismiss or, on summary judgment, to make out a case for a jury. We therefore affirm the District Court's judgment on Count IV.

IV.

For the reasons stated in part III of this opinion, the judgment of the District Court is

AFFIRMED.